## State of Vermont v. Gary Lee Schaefer
## Herald Association, et al., Intervenors

[599 A.2d 337]

Nos. 84-484 and 84-515

Present: **Allen, C.J., Peck, Gibson,**[1] **Dooley and Morse, JJ.**

Opinion Filed September 6, 1991

Dissenting Opinion Filed September 13, 1991

---

[1] Justice Gibson sat for oral argument but did not participate in this decision.

*Robert B. Hemley* and *Dennis R. Pearson* of *Gravel and Shea*, Burlington, for Intervenors-Appellants.

*Walter M. Morris, Jr.*, Defender General, and *Henry Hinton*, Appellate Defender, Montpelier, for Defendant-Appellee.

**Dooley, J.** Intervenors-appellants appeal the district court's orders sealing the affidavits of probable cause, closing partially

a hearing on a motion to suppress and further prohibiting all law enforcement officers and all attorneys associated with defendant's case from making any public statements about this criminal case. Intervenors are the publishers of daily newspapers in Vermont. They argue that the orders violate the First Amendment rights of the public to obtain information about the operation of the courts. We agree and reverse.

Defendant Gary Schaefer was arraigned on the charge of second-degree murder on May 10, 1984. He pled not guilty, and upon the request of his attorney, the court issued an order sealing the affidavit of probable cause to preserve defendant's state and federal constitutional rights. The court's order also prohibited all law enforcement officers and all attorneys associated with the case from making any statements "either at public meetings or proceedings intended for public reporting or dissemination" concerning the merits of the case, the evidence in the case, or any other matters that were not of record in the court.

On May 22, 1984, appellants filed a "Motion to Intervene" and a "Motion for Relief from Order," seeking access to the affidavit of probable cause. The trial court denied the motions without prejudice because appellants lacked any legal status within the pending criminal prosecution and because the motion to intervene was not supported by a memorandum of law as required by V.R.Cr.P. 47(a). Appellants then filed a motion for reconsideration, and an evidentiary hearing was held on this motion. The witnesses consisted of editors of appellant newspapers. Also admitted were newspaper stories about another murder prosecution against defendant for which he was convicted in December of 1983. The court refused to admit surveys taken by reporters for appellants based on random interviews of newspaper readers. In the interview, the reporter asked each person to answer the question: "Who is Gary Schaefer?"

Based on the evidence, the court made findings and denied the motion to reconsider. The court found that reporters for appellants had no familiarity with the standards established by the American Bar Association which prohibit the dissemination of pretrial criminal information if such release would pose a clear and present danger to the fairness of the trial. The newspapers themselves have no standards or policy concerning what

to print from pretrial proceedings except that they will not print libelous news. Essentially, the court found, the newspapers' "guidelines are to go out and cover the story and whatever information is found becomes fair to report," including the prior criminal record of the accused, the content of a defendant's confession or admissions and the content of a defendant's testimony during a suppression hearing. Furthermore, appellants have published such information in the past and would not withhold such information from publication if requested to do so. The court specifically noted that one of the newspapers had published defendant's confession in the prior murder case "before trial of the case and even before the defendant was charged" and all of the newspapers, and the local television station, reported on the confession despite the pendency of a motion to suppress it. The court further found that these newspapers have widespread circulation and readership throughout Vermont, and, as a result, "[i]t is fair to say such a case as this would be almost totally published throughout the entire State."

Based upon these findings, the trial court concluded that "Defendant has demonstrated by clear necessity the need for the affidavit to remain sealed and that no reasonable alternatives exist to protect his right to a fair trial and an untainted jury pool."[2] The court relied on its finding that appellants would print the content of the affidavits of probable cause regardless of the effect of that publicity on defendant's right to a fair trial and that there would be "wide spread, general publicity of the contents of the Affidavits" right up to the date of the trial. The court rejected the alternatives, concluding that a continuance was not possible, that change of venue would be of "little practical benefit" in the face of the statewide publicity and that no amount of voir dire would be effective where a juror knew of a suppressed statement by defendant.

As to the restrictive order, the court found that defendant had shown a "clear necessity" for such an order in light of the

[2] The court also concluded that the affidavit of probable cause was not a public record, and appellants had no right to have it disclosed. This basis for sealing affidavits of probable cause was rejected in *State v. Tallman*, 148 Vt. 465, 472, 537 A.2d 422, 426 (1987), and, therefore, has not been considered further in this opinion.

publicity. The court upheld the restrictive order, concluding it justified by the same facts that justified the sealing order.

Following the ruling on the motion for reconsideration, the trial court considered a motion to suppress statements made by defendant to the police. Defendant sought closure of the hearing on the motion, and appellants objected. Based on its findings in connection with the sealing order, the court ruled that closure was needed as to "questions and answers of an interrogatory interview with the Defendant." The court's ruling indicated that the content of that interview was set forth in the affidavit of probable cause so that partial closure necessarily followed from the sealing of the affidavit. The court added that a change of venue would require jury selection from persons that "don't know anything about current events" and that intensive voir dire would not work because potential jurors are not always "totally frank about what they know about a case" and because they may recall what they read only after the start of the trial.

Following the hearing, the court granted the motion to suppress. The prosecutor dismissed the case in April of 1985.

Appellants make four arguments on appeal: (1) the proper standard for any restriction on qualified First Amendment access rights is a demonstration of a substantial probability of irreparable damage to defendant's Sixth Amendment rights; (2) the court's closure and sealing orders do not meet this standard because they are based upon presumed damage and not actual damage of defendant's rights; (3) the court inadequately considered reasonable alternatives to closure and sealing; and (4) the restriction on extra-judicial statements (the "gag order") is unjustified by the record and is unconstitutionally overbroad.

■ Although no party has contested the issue, we first look briefly at our jurisdiction in this case. We have held that the media may directly intervene in a criminal proceeding for purposes of seeking access to proceedings or papers. *State v. Tallman*, 148 Vt. 465, 468, 537 A.2d 422, 424 (1987). Once representatives of the media intervene, as they have here, they have standing to appeal to this Court from orders denying them access to papers or proceedings.

■ When the issues reach this Court, however, there is rarely a live controversy. This criminal case has been dismissed,

and the reasons for sealing the papers or closing the proceedings have long passed. Nevertheless, we have held in a similar case that the circumstances fit an exception to the mootness doctrine for issues capable of repetition yet evading review. *Id.* at 469, 537 A.2d at 424–25. We agree that this case also fits the exception to the mootness doctrine although we caution that this is not a holding that all media access cases so fit. As discussed below, this appeal raises general questions about the proper standard to apply in balancing the right of access to criminal proceedings and documents against the Sixth Amendment right of a criminal defendant to a fair trial. As the general questions are answered, however, these cases will become more fact specific, and the exact questions are less likely to recur in the future. Further, the lengthy delay between the trial court ruling and the action in this Court means that the trial courts often do not have the benefit of the latest decisions in this Court although there is no reason to believe that they would fail to follow them. See *Johnson Newspaper Corp. v. Morton,* 862 F.2d 25, 30 (2d Cir. 1988). These considerations may warrant a conclusion that particular press access cases are moot when presented to this Court.

An understanding of appellants' first argument requires a revisiting of our two decisions in the area of press access to judicial proceedings and records in criminal cases, *State v. Tallman, supra,* and *Greenwood v. Wolchik,* 149 Vt. 441, 544 A.2d 1156 (1988). A case similar to this one, *Tallman* involved access to an affidavit of probable cause and a pretrial suppression hearing. The significance of *Tallman* is very much in issue, however, because only a four-member Court rendered the decision and it split 2-to-2 on the major issues within it. The decision in *State v. Tallman* is really two opinions, agreeing on the result, but disagreeing on parts of the requisite analysis.

The opinions do agree on a general policy statement:

[W]e start with the presumption that pretrial proceedings and documents are open to the public, closure being the exception rather than the rule. This is because "[o]penness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."

*Tallman*, 148 Vt. at 474, 537 A.2d at 427 (quoting *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 508 (1984) (*Press-Enterprise I*)) (citation omitted). Hence, both opinions recognize that the press and public have a qualified right of access to pretrial suppression hearings and affidavits of probable cause, which must be balanced with defendant's Sixth Amendment right to a fair trial. Having recognized this qualified right of access, the *Tallman* Court split on the proper standard by which to evaluate sealing and closure orders. The opinion for the Court concluded that the proper standard should be derived from *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986) (*Press-Enterprise II*). That standard is phrased as follows:

> "If the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed [or document sealed] only if specific findings are made demonstrating that first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights."

*Tallman*, 148 Vt. at 474, 537 A.2d at 428 (quoting *Press-Enterprise II*, 478 U.S. at 14). The concurring opinion of Chief Justice Allen disagreed that the *Press-Enterprise II* standard was appropriate with respect to the closure of the suppression hearing and apparently with respect to the sealing of the probable cause affidavit. In his view, the difference lies in the nature of the suppression hearing and the probable cause affidavit in the criminal justice system and the risk of harm to the defendant's fair trial rights. He concluded that a defendant seeking closure must only demonstrate that the right to a fair trial would likely be prejudiced by publicity generated by the suppression hearing. *Id.* at 476, 537 A.2d at 429. (Allen, C.J., concurring). He agreed with the opinion of the Court that the trial court must draw its order narrowly to preserve the competing interests, *id.* at 478, 537 A.2d at 430 (Allen, C.J., concurring), and agreed with the conclusion that the trial court failed to do so in the *Tallman* case.

*Greenwood* involved a challenge to the trial court's allowance of press access to an affidavit of probable cause. The defendant

requested that this Court limit its *Tallman* holding that the press has a qualified First Amendment right of access to the affidavit, drawing analogy to the secrecy of grand jury action where the case is started by indictment. We declined to modify the *Tallman* holding. 149 Vt. at 445, 544 A.2d at 1158. Because of the limited issue before us, we did not have to reach the standard for resolving the competing interests.

■ The first issue raised here seeks to define the proper standard that must be met before a court can seal an affidavit of probable cause or close a hearing where the contents of that affidavit will be disclosed. This is the issue that split the four-Justice Court in *Tallman*. In analyzing this question, we must be explicit on the source of the public's access right to the probable cause affidavit. The Court in *Tallman* relied upon the common law right of access to court documents set forth in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978), although it later referred to a First Amendment right of access. *Tallman*, 148 Vt. at 472–73, 537 A.2d at 426–27. The decision by the Chief Justice in *Greenwood* referred to the "'constitutional and common law right of access to court records and proceedings.'" 149 Vt. at 442, 544 A.2d at 1157 (quoting *State v. Tallman*, 148 Vt. at 472, 537 A.2d at 427). Most courts that have confronted the issue of access to judicial documents in criminal cases have held that the First Amendment creates a qualified right of access to most pretrial documents as well as to pretrial court proceedings. See *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 502 (1st Cir. 1989); *United States v. Suarez*, 880 F.2d 626, 631 (2d Cir. 1989); *United States v. Smith*, 776 F.2d 1104, 1112 (3d Cir. 1985); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986); *United States v. Peters*, 754 F.2d 753, 763 (7th Cir. 1985); *In re Search Warrant for Secretarial Area—Gunn*, 855 F.2d 569, 573 (8th Cir. 1988); *Seattle Times Co. v. United States Dist. Ct. for W.D. of Wash.*, 845 F.2d 1513, 1517 (9th Cir. 1988). We read *Tallman* and *Greenwood* as adopting that holding at least with respect to affidavits of probable cause.

■ We have carefully examined the numerous opinions that have been handed down by state and federal courts since *Tallman*. Every court that has recognized a qualified First Amendment right of access to judicial records has held that sealing

orders are valid only on a showing of "substantial probability that the defendant's right to a fair trial will be prejudiced by publicity" as required by *Press-Enterprise II*, 478 U.S. at 14, and the opinion for the Court in *Tallman*, 148 Vt. at 474, 537 A.2d at 428. See, e.g., *In re State-Record Co.*, 917 F.2d 124, 128 (4th Cir. 1990); *Oregonian Pub. Co. v. United States Dist. Ct.*, 920 F.2d 1462, 1466 (9th Cir. 1990); *Russell v. Miami Herald Pub. Co.*, 570 So. 2d 979, 982 (Fla. Dist. Ct. App. 1990). Similarly, every court that has found a qualified First Amendment right to attend a particular pretrial event has also found that closure of the event to the public can be done only where the *Press-Enterprise II* standard has been met. See, e.g., *Associated Press v. Bell*, 70 N.Y.2d 32, 38, 510 N.E.2d 313, 316–17, 517 N.Y.S.2d 444, 447–48 (1987); *State ex rel. The Repository v. Unger*, 28 Ohio St. 3d 418, 422, 504 N.E.2d 37, 40 (1986).[3]

■ Once we clearly ground the public right of access in the First Amendment, we find no relevant distinction between this case and *Press-Enterprise II* for purposes of establishing a standard for sealing or closure. The threat to defendant's fair trial right is identical whether probable cause is determined based on an affidavit or based on an evidentiary hearing. We are persuaded by both this reasoning and the unanimity of authority from other courts that the *Press-Enterprise II* standard applies to the sealing of the probable cause affidavit and closing of the suppression hearing in this case.

---

[3] The concurrence cites two states where it asserts the courts have adopted different standards. The New Jersey case, *State v. Halsey*, 218 N.J. Super. 149, 153–55, 526 A.2d 1165, 1167 (1987), adopts no standard, holding rather that the result is the same whichever standard is used. The first Utah case, *Kearns-Tribune Corp. v. Lewis*, 685 P.2d 515 (Utah 1984), precedes *Press-Enterprise II* and adopts a standard for public access inconsistent with *Press-Enterprise II*. Since both it and *Press-Enterprise II* involve the same issue of access to a preliminary hearing, its holding on the standard question can not be taken to have survived *Press-Enterprise II*. The standard question was not in issue in the second Utah case, *Society of Professional Journalists v. Bullock*, 743 P.2d 1166 (Utah 1987); the issue was whether there was a right of access to a competency hearing under any circumstances. The court simply applied the holding of the first case to a different situation with no apparent awareness that the intervening decision in *Press-Enterprise II* made part of the prior holding erroneous. Indeed, *Press-Enterprise II* is never cited in the opinion.

Establishing the proper standard does not decide this case. There is no relevant difference between the standard used by the trial court and that set forth in the Court's opinion in *Tallman*. Although *Tallman* had not been decided when the trial court acted here, it clearly was aware that it had to find an overriding defendant interest and prejudice to that interest to seal the affidavit. Its "clear necessity" standard, although not phrased in the language of *Tallman* and *Press-Enterprise II*, makes clear that it found the necessary prejudice to warrant sealing of the affidavit. It would be an exercise of form over substance to require the trial court to reevaluate its conclusion in light of the specific *Tallman* standard.

Thus, we must reach appellants' next argument that the sealing and closure orders cannot be upheld under the *Tallman* balancing standard. We start with appellants' argument that defendant has failed to show a substantial probability of prejudice as a result of public access to the affidavit of probable cause.

If sealing the affidavit and closing the pretrial hearing were the only method available to protect defendant's fair trial right from the effects of publicity, we would probably affirm the sealing and closure orders in this case. The probable cause affidavit contains information—that is, admissions by defendant to the police—that defendant sought to suppress. If the information were suppressed, it would be critical that potential jurors not know of the information. See *Associated Press v. Bell*, 70 N.Y.2d at 38, 510 N.E.2d at 316, 517 N.Y.S.2d at 447. There is no doubt that appellants would publish this information. There has been widespread publication of the fact that defendant has been convicted of murder of a young woman and has admitted to having committed a second murder of a young woman before this prosecution was commenced. The events arose in a relatively small town. See *Newspapers of New England v. Clerk-Magistrate*, 403 Mass. 628, 633, 531 N.E.2d 1261, 1264 (1988), *cert. denied*, 490 U.S. 1066 (1989) (fact that murder occurred in small rural community significant factor in support of closure).

There are also countervailing factors. The probable cause affidavit is filed at the very beginning of a case. It is likely to be many months before the case comes to trial. See *Seattle Times v. United States Dist. Ct. for W.D. of Wash.*, 845 F.2d at 1518

(two months would elapse before trial). The press coverage up to the time of the hearing had been factual and not inflammatory. See *id.* at 1517 (pervasive pretrial publicity is not conclusive; publicity must create pattern of deep and bitter prejudice in community). However, the press regularly reported defendant's earlier conviction and the events surrounding it. Defendant's right to a fair trial would be threatened by jurors' knowledge of his history. Thus, the added information contained in the probable cause affidavit may not be significant since any potential juror who read the earlier stories anyway could not sit. While the trial court was offered evidence to show the readership of the newspapers printed by appellants, there was a dearth of evidence on whether potential jurors who were unaware of the case could be found in the community.

■ We conclude, however, that the seal and closure orders run afoul of the second prong of the *Tallman* standard—that is, that such orders be issued only if alternatives that would adequately protect the defendant's rights be unavailable. *Tallman*, 148 Vt. at 474, 537 A.2d at 428. Appellants argue that the trial court failed to weigh properly the alternatives that do exist.

The second prong of the *Tallman* test is derived from *Press-Enterprise II*. The Court in *Press-Enterprise II* stated:

> But this risk of prejudice does not automatically justify refusing public access to hearings on every motion to suppress. Through *voir dire*, cumbersome as it is in some circumstances, a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict. And even if closure were justified for the hearings on a motion to suppress, closure of an entire 41-day proceeding would rarely be warranted. The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of that right. And any limitation must be "narrowly tailored to serve that interest."

478 U.S. at 15 (quoting *Press-Enterprise I*, 464 U.S. at 510). The alternatives that needed to be considered here included partial disclosure, voir dire and change of venue. See *Herald Ass'n v. Ellison*, 138 Vt. 529, 534, 419 A.2d 323, 326 (1980).

■■ We note at the outset that although the court's primary concern was with the part of the affidavit that disclosed

that defendant had made a statement that might be suppressed, the court considered the sealing motion as an all or nothing proposition. Pretrial publicity per se will not interfere with defendant's fair trial right. Rather, interference comes from publicity that may inflame and prejudice the whole community and prevent the impanelling of an unbiased jury. See *Seattle Times v. United States Dist. Ct. for W.D. of Wash.*, 845 F.2d at 1517. Obviously, not all of the information in the affidavit could have such an effect. The court, then, if it orders sealing at all, must consider first redacting the portions of the affidavit that create the substantial probability of prejudice to defendant's fair trial right and releasing the remainder. See *In re State-Record Co.*, 917 F.2d at 129. A court rejecting the appropriateness of redaction must make "specific reasons and findings on the record," *id.*, a step not taken by the trial court here.

We also note that the court ordered a permanent sealing of the probable cause affidavit. As a result, the press still has not gained access to the affidavit, though the State dismissed this case years ago. A sealing order should not extend beyond the time necessary to protect defendant's fair trial rights. See *Herald Ass'n v. Ellison*, 138 Vt. at 534–35, 419 A.2d at 326–27 (order that extends beyond time necessary to protect defendant's fair trial right is void).

We cannot conclude, however, that either redaction or a time limit would have been sufficient to protect the public access right in this case. While the trial court considered the alternatives of voir dire and change of venue, it dismissed them summarily without serious consideration. We believe that the alternatives were not properly evaluated under *Press-Enterprise II*.

As a basic principle, voir dire is the normal and preferred method of combating any effects of pretrial publicity. *In re Charlotte Observer*, 882 F.2d 850, 855 (4th Cir. 1989). As the United States Court of Appeals for the Third Circuit noted:

> Since the inception of our criminal justice system, courts have acknowledged the utility of skillfully conducted *voir dire* as a means of ascertaining a prospective juror's impartiality. . . . "[T]esting" by *voir dire* remains a preferred and effective means of determining a juror's impartiality and assuring the accused of a fair trial.

*United States v. Martin,* 746 F.2d 964, 973 (3d Cir. 1984). Of course, publicity about a case may be so pervasive and damaging that voir dire is ineffective to combat it.

■■■ We cannot conclude that the potential publicity in this case, especially if combined with a change of venue, would rise to the level where voir dire would be ineffective. Although we share the trial court's concern that potential jurors who have read about defendant's confession would have difficulty being open-minded, there is no evidence to show that a jury free of such persons could not be drawn in the district in which the case is heard, and the trial court made no finding on this issue.[4] We do not believe that the fact that the case is covered by newspapers with statewide circulation means that there will be widespread knowledge of the facts reported in all areas of the state or even in the community where the crime occurred. While the evidence of publicity here was greater than what we categorically rejected as insufficient in *Greenwood v. Wolchik,* 149 Vt. at 445, 544 A.2d at 1158–59 (evidence consisted of two front-page stories in the local newspaper and a showing that this newspaper reached half the homes in the county), it is not sufficient to show that voir dire would be ineffective. Ironically, the only direct evidence of community knowledge of the case—that is, the survey conducted by the newspapers—was rejected by the trial court.

Nor can we accept the additional reasons proffered by the trial court to reject reliance on voir dire—that jurors would not remember the newspaper accounts until after they were impanelled and that potential jurors are not always candid. Such reasoning amounts to a total rejection of the use of voir dire to avoid impanelling prejudiced jurors. We believe that skillful voir dire can overcome these problems.

■■■ We also believe that the trial court erred in dismissing the effect of a change of venue in this case. The trial court had

[4] In view of our disposition, we do not need to address whether the trial court can award defendant more peremptory challenges than the six provided in 12 V.S.A. § 1941 and V.R.Cr.P. 24(c)(3) in order to ensure a fair jury is impanelled. Nor need we determine whether a "struck jury" system might be implemented in an appropriate case. See *State v. Halsey,* 218 N.J. Super. at 162–64, 526 A.2d at 1171–72.

granted a change of venue in defendant's earlier murder trial, and the need for one was probably greater in this case. In evaluating the sealing decision, the court needed to consider whether a change of venue was otherwise likely or should be ordered to respond to the potential prejudice from disclosure of the information in the probable cause affidavit. The court did so only perfunctorily, concluding that since the publicity was statewide, the same probability of prejudice existed throughout the state. As our discussion above indicates, we cannot equate publicity with widespread knowledge among potential jurors. It may be in most cases that persons remote from the scene are less likely to read about a crime and that the stories will be less obvious—for example, they may be shorter, have smaller captions and/or be on pages less often read.

Having concluded that the sealing and closure orders cannot be upheld in view of the findings and record, we turn to the order that the lawyers and law enforcement officers not comment on the merits of the case or make statements "as to any evidence which has been secured in connection with this matter or any other matters that are not of record in the court." Appellants attack this order under standards similar to those applicable to the sealing and closure orders.

We recognize in appropriate cases an order similar to that present here may be necessary to ensure that information contained in sealed documents or closed hearings is not leaked to the press. We also recognize that attorneys and those who work for them are restricted by ethical rules from making extrajudicial statements. See Code of Professional Responsibility DR 7-107; *Florida Freedom Newspapers v. McCrary*, 520 So. 2d 32, 35 (Fla. 1988). In view of the ethical restraints and the intrusion into the rights of the parties and their counsel, we do not believe that a nondisclosure order of this type is justified without a finding that, absent the order, one or more of the persons covered would make an improper disclosure. *In re New York Times Co.*, 878 F.2d 67, 68 (2d Cir. 1989). Further, the order must be narrowly tailored to cover only the improper disclosure that would occur in the absence of the order. See *New York Times Co. v. Rothwax*, 143 A.D.2d 592, 592–93, 533 N.Y.S.2d 73, 74 (1988); *State ex rel. National Broadcasting Co. v. Court of Common Pleas*, 52 Ohio St. 3d 104, 112, 556 N.E.2d

1120, 1125 (1990). There was no finding of necessity here, and the order was overbroad. Even if we had not reversed the sealing order, we cannot affirm the order prohibiting statements about evidence in the case or other matters not of record.

 Ordinarily, we would remand to enable the trial court to evaluate appellants' motion under the standards we have announced herein. A remand is unnecessary here because the passage of time has made any sealing or closure orders inappropriate.

*Reversed.*

**Allen, C.J.,** concurring in the result. I do not agree with the majority's assertion that the unanimity of authority and its reasoning since *Press-Enterprise II* was decided should be persuasive on the issue of the correct standard for sealing or closure. The reasoning in the first case cited in support of this proposition, *In re State-Record Co.*, 917 F.2d 124, 128 (4th Cir. 1990), simply consists of the statement that the issue had been resolved in an earlier Fourth Circuit case. *State-Record Co.* also inexplicably[1] stated that the standard for the issuance of orders prohibiting potential witnesses, parties and attorneys from discussing a pending case with the media required a showing of no more than a reasonable likelihood of prejudice for their issuance. No suggestion is given as to why the standard for the issuance of a "gag" order should differ from the issuance of a closure order. The case upon which *In re State-Record Co.* relies is *In re Charlotte Observer*, 882 F.2d 850 (4th Cir. 1989). The "reasoning" in that case was a statement that the presumption of openness may be overcome by finding that there is a substantial probability that defendant's right to a fair trial will be prejudiced, citing *Press-Enterprise II. Oregonian Publishing Co. v. United States District Court*, 920 F.2d 1462 (9th Cir. 1990), is likewise poor authority for the proposition for which it is cited. There, the district judge, at the defendant's request, sealed a plea agreement, concluding that the safety of the de-

---

[1] I say inexplicably because these orders, characterized as "gag" orders by the media, are often classic examples of prior restraint and are deemed to be "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562 (1976).

fendant and his family would be placed in jeopardy if its contents were disclosed. While the opinion states that the *Press-Enterprise II* requirements must be met before documents may be closed to the public, the sealing had nothing to do with the defendant's right to a fair trial under the Sixth Amendment. The holding in *Russell v. Miami Herald Publishing Co.*, 570 So. 2d 979 (Fla. Dist. Ct. App. 1990), suffers from the same infirmity. The issue there was the relevant inquiry for a court in determining whether a prior order expunging court records should be vacated. The court concluded that the *Press-Enterprise II* standards should be followed, but again the defendant's right to a fair trial was not at issue. 570 So. 2d at 983. *State ex rel. The Repository v. Unger*, 28 Ohio St. 3d 418, 504 N.E.2d 37 (1986), cited for the proposition "that closure . . . to the public can be done only where the *Press-Enterprise II* standard has been met," simply does not say this. This leaves *Associated Press v. Bell*, 70 N.Y.2d 32, 39, 510 N.E.2d 313, 317, 517 N.Y.S.2d 444, 448 (1986), where the Court of Appeals of New York did state that the defendant must demonstrate a substantial probability of prejudice on the authority of *Press-Enterprise II*.

The Supreme Court of Utah has adhered to the lesser standard for closure. In *Kearns-Tribune Corp. v. Lewis*, 685 P.2d 515, 524 (Utah 1984), the court extended the openness of trials to preliminary hearings, but held that preliminary hearings in criminal cases may be closed when openness presents "a realistic likelihood of prejudice" to a defendant's right to a fair trial. The preliminary hearings in this state are used to determine if there is "probable cause to believe that the crime charged has been committed and that the defendant committed it." *Id.* at 520. In *Society of Professional Journalists v. Bullock*, 743 P.2d 1166, 1177 (Utah 1987), the court continued to follow this standard when it extended it to pretrial competency proceedings in criminal cases. "There is no apparent reason to distinguish between the factors relevant to closure of a preliminary hearing and closure of a competency proceeding; therefore, we conclude that the steps to be followed by a trial court in either instance are [those] set forth in *Kearns-Tribune*." *Id.* at 1178.

The only other court which has expressly addressed the issue dividing this Court is the Superior Court of New Jersey, which

stated that the right to an open trial prevails unless a defendant can "demonstrate that there is a realistic likelihood that his right to an impartial jury will be threatened from adverse publicity." *State v. Halsey*, 218 N.J. Super. 149, 154, 526 A.2d 1165, 1167 (1987). It then observed that this test might arguably be no longer viable under *Press-Enterprise II. Id.*

It might be said that we are quarreling over semantics. I believe otherwise. The prejudice that may result from disclosure of matters that are ultimately suppressed is well set forth in *Westchester Rockland Newspapers v. Leggett*, 48 N.Y.2d 430, 439, 399 N.E.2d 518, 523, 423 N.Y.S.2d 630, 635 (1979):

> If these hearings were open to the public and the press in a well-publicized case, it is most likely that the substance of the evidence would be disclosed to the community from which the jurors would be drawn, even though the court may ultimately rule that the evidence should not be submitted to the jury at trial. This would not only destroy the purpose for which the hearing was held, but would, perversely, have the very opposite effect of that intended and desired. Instead of shielding the jurors from evidence they should not hear, the public airing at the pretrial suppression hearing would serve to broadcast the evidence to most, if not all potential jurors.

I find nothing in the cases cited in the majority opinion that persuade me to abandon the position I took in *Tallman*. The holding in *Press-Enterprise II* can be read, and should be read, to be limited to preliminary hearings as they are conducted in California. The danger from the stricter standard was well expressed by Justice Powell in his concurring opinion in *Gannett Co. v. DePasquale*, 443 U.S. 368, 399–400 (1979), where, in response to the suggestion in Justice Blackmun's opinion advocating the substantial probability requirement, he stated:

> It is difficult to imagine a case where closure could be ordered appropriately under this standard. A rule of such apparent inflexibility could prejudice defendant's rights and disserve society's interest in the fair and prompt disposition of criminal trials. As a result of pretrial publicity, defendants could be convicted after less than the meticulously fair trial that the Constitution demands. . . . The question

for the trial court, therefore, in considering a motion to close a pretrial suppression hearing is whether a fair trial for the defendant is likely to be jeopardized by publicity, if members of the press and public are present and free to report prejudicial evidence that will not be presented to the jury.

In *Waller v. Georgia*, 467 U.S. 39, 48 (1984), the United States Supreme Court clearly stated that the party seeking closure of a suppression hearing must advance an overriding interest that *is likely to be prejudiced. Press-Enterprise II* did not expressly overrule *Waller* and, until it does so, this Court should adhere to a standard that recognizes the existence of the right to a fair trial under the Sixth Amendment.[2] The standard for closure adopted by the majority imposes too severe a burden on a defendant seeking closure. It is difficult to conceive of a fact pattern where sealing or closure could ever be granted under the substantial probability standard.

I concur in the result because I do not believe that the trial court adequately explored the alternatives to closure in this case. But I also believe that the majority opinion overstates the effectiveness of the alternatives. Vermont is a small state with a small population. Major crimes are covered in all parts of the state by a relatively small number of newspapers, radio and television stations. The damage to the fair trial right can be devastating where the entire populace is exposed to the contents of a confession or evidence later suppressed. I do not believe, as the majority seems to suggest, that change of venue or effective voir dire can eliminate the potential for prejudice in every case. Change of venue suffers from the drawbacks set forth in *Herald Ass'n v. Ellison*, 138 Vt. 529, 534, 419 A.2d 323, 326 (1980).[3] The majority's suggestion that skillful cross-exam-

---

[2] Justice Stevens in his dissent concludes that *Press-Enterprise II* does reverse earlier holdings that a "reasonable probability of prejudice" is enough to overcome the First Amendment right of access to a preliminary proceeding. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 17 (1986) (Stevens, J., dissenting).

[3] "Change of venue, for example, is frequently referred to as a ready expedient for avoiding prejudicial publicity problems. However, it is a remedy which should not lightly be resorted to. Quite apart from the added expense

ination can always expose the juror who is not candid seems to contradict the observation by the author of the opinion in *In re Nash*, 158 Vt. —, —, 614 A.2d 367, 375 (1991), Dooley, J., dissenting ("No amount of questioning of the juror alone would have shown the true facts.").

The effectiveness of voir dire as a curative device for adverse publicity has been further undermined by the U.S. Supreme Court in *Mu'Min v. Virginia*, — U.S. —, 111 S. Ct. 1899 (1991), where the Court concluded that neither the Sixth nor Fourteenth Amendments require interrogation of a prospective juror with respect to what a juror has read or heard about the case. Content questions are not required. All that seems to be required is the acknowledgment by the juror that information has been acquired and the promise that the information would not affect the juror's impartiality. In this case there would be no constitutional prohibition against allowing a juror to sit who had knowledge of the admissions and previous convictions, as long as the promise was made to keep an open mind and wait until the entire case was presented before reaching a final opinion. The assurance offered by such a promise is dampened by the observation in *Irvin v. Dowd*, 366 U.S. 717, 728 (1961): "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father."

Our responsibility is to assure the public's First Amendment right of access while protecting the defendant's Sixth Amendment right to a fair trial. We do not carry out this responsibility by abrogating one right in favor of the other. The imposition of the substantial probability of prejudice standard seriously erodes the fair trial right.

**Peck, J.,** dissenting. In considering the merits of the majority opinion in this case, I was reminded of a brief exchange, con-

---

to the state and the taxpayers, and the burden and inconvenience to trial participants which it causes, a venue change erodes, at least in spirit, the defendant's right to trial 'by an impartial jury of the country.' Vt. Const. ch. I, art. 10. That provision is some recognition of a common law right to be tried locally, and has legislative implementation in our venue statutes." (Citations omitted.)

tained in a dialogue between Hamlet and that meddlesome old fussbudget Polonius in Shakespeare's play.[1] Finding the Prince reading a book, the old man inquires, "What do you read, my lord?" To which Hamlet responds, "Words, words, words."

Notwithstanding the legalese which characterizes the majority opinion,[2] it is completely devoid of even a pretension of analysis, to say nothing of a genuine balancing. Rather it adopts a sort of "monkey see, monkey do" approach, relying, inter alia, on broad conclusory and unsupported statements contained in opinions from other jurisdictions, and the purest of speculation without anything at all to raise it above the level of unadulterated guessing as to what would or would not happen in certain circumstances.

The majority acknowledges the need to balance "the right of access to criminal proceedings . . . [under the First Amendment] against the Sixth Amendment right of a criminal defendant to a fair trial." It is clear enough, however, that this acknowledgment is the only recognition of balancing forthcoming. The opinion from start to finish bears not the slightest resemblance to any fair concept of balancing.

The media interests here so obviously hold the majority in thrall that the outcome is not in doubt for a minute. The opinion throughout gives undiluted primacy to the media's First Amendment rights, treating the Sixth Amendment rights of a defendant, not as a co-equal constitutional guarantee, but as no more than a pestiferous, nitpicking nuisance, standing momentarily in the way, to be disposed of as summarily as may be. The opinion treats media rights as supreme and the defendant's rights to a fair trial as secondary and virtually nonexistent ex-

---

[1] "Hamlet," II, ii.

[2] I hasten to add, with appropriate blushes, before someone else does it for me, that this dissent is no less "wordy" than the majority opinion, and suffers from repetition. Nevertheless, I like to think that I have analyzed the situation presented to us on the basis of *reality*, which I believe the majority has failed to do on any basis. The repetition has two parents: the genuine concern I feel at an unjust result leads me to emphasize and reemphasize certain aspects of the case: the real world consequences thereof, the primacy accorded First Amendment rights at the unconscionable expense of the Sixth Amendment, and secondly, my empathy for the depths into which the majority has plunged those seeking their rights to a fair trial; "*de profundis*" indeed!

cept in the most egregious and unlikely circumstances that can be imagined. And this, notwithstanding both are clear and equally constitutional rights.

Chief Justice Allen hit the target squarely, albeit more politely than my concern permits me to emulate, in his concurring opinion: "It is difficult to conceive of a fact pattern where sealing or closure could *ever* be granted under the substantial probability standard." (Emphasis added.) I agree with the view of the Chief Justice to the extent of that statement. It exposes the majority's exercise in constitutional favoritism and inexcusable obeisance to the media on the one hand and, on the other, its relative indifference to the extreme uncertainty confronting a defendant.

The result reached by the majority, together with the one-sided rationale employed in the opinion to justify that result, must be a bitter pill for defendants-to-be in criminal cases, as well as the defense bar generally, and others who are concerned that those who stand before the courts charged with a crime receive the fair trial (in fact, not just theory) to which they are entitled.

It is the epitome of irony, in the light of today's decision, that an accused in a criminal case is supposedly presumed innocent until the state proves his guilt beyond the shadow of a doubt. He should receive from the court every protection possible in support of that presumption, to the end that the trial which lies before him is in fact a *fair* trial beyond any question, before an unbiased jury with as little foreknowledge as it is humanly possible to provide.

The majority opinion is slanted towards the ultimate result from the outset. In the opening paragraph it cites, as the primary and underlying issue, the argument of the media-appellants that their constitutional rights under the First Amendment to the United States Constitution were violated by certain orders of the trial court.

It is significant that even at this preliminary stage the majority indicates no concern whatever for defendant's right to a fair trial; indeed, this right is addressed in the opinion only in relation to its impact on First Amendment rights. The whole thrust of the opinion is a labored attempt to "get around" the defendant's Sixth Amendment fair trial rights with arguments that

are pure theorizing, speculation, and assumptions having no counterpart in reality. The opinion is a dark monument to those who take up residence in the ivory tower of theory, as distinguished from practical and actual experience in the real world.

I have reservations that the so-called underlying issue identified by the majority, that is, whether appellants' First Amendment rights were violated, considered in isolation, is relevant at all. Nevertheless, for purposes of argument only, I will *assume*, at this point, that those rights were violated by the challenged orders of the court. I would add, however, that, in fact, it is *not* the underlying issue at all; to say it is gives a one-sided and unwarranted emphasis on media rights at the expense of Sixth Amendment rights. It is equally important in every respect, however, to determine whether defendant's Sixth Amendment rights were also violated.

With that arguendo assumption, my initial response is a colloquial "So what?" To understand the real issue here one need only ask the very simple question: given a potential conflict between First and Sixth Amendment rights, which has primacy? Before concluding this dissent, it will be necessary to add and examine an additional factor, that is, whether these potentially conflicting interests can be *validly* reconciled or balanced. At the outset, however, I will assume they cannot and proceed on that basis.

The obeisance which the courts so often make to the news media is difficult to understand. Except to the extent the courts have played their games with the phrase "freedom of the press," the First Amendment guarantees the media, with some limited exceptions such as national security, no more than the rights which every *individual* enjoys equally; that is, to inquire into, and investigate, the workings of their government. The media has, of course, a clear advantage because of the resources, including facilities, equipment, personnel, and time available to support investigations. There is relatively little if any necessary significance to the words "freedom of the press" which, technically at least, confers no greater rights on the media than those shared by every individual citizen.

Whatever may be said for rights of access to public records and documents granted by statute, common law, or both, it is *not* a result of the First Amendment. As the latter is struc-

tured, it insures the right of the news media to inquire and investigate freely and without being hampered by state or federal law. Standing alone, it imposes no reciprocal *obligation* on governmental agencies or their officials and employees to open their files to anyone, give out requested information orally, or respond to questioning. It is a hands-off mandate only; it does not order cooperation. The political consequences of failures and refusals to cooperate may not be salutary in many cases, but that is not the issue here. Rights of public and media access, and obligations on government to disclose, are creatures of the common law and statutes, not the First Amendment.

It is also true that the First Amendment imposes no obligation, no *duty*, on the media to investigate or to publish anything; its boundaries are limited generally only by its own discretion. No one denies the great importance of the First Amendment as it relates to the news media, even though the actual exercise of these rights are often controversial in the face of insensitivity, sensationalism, and unconscionable—even if technically legal—intrusion into individual privacy. Nevertheless, the public's knowledge of their government, and governmental agencies and officials, would be seriously endangered without those rights. So much for the First Amendment.

Turning to the Sixth Amendment, one thing has always impressed me. It is one of the relatively few sections of the Bill of Rights which addresses the rights of individuals, *as* individuals, rather than collectively by class. Thus, the provisions refer to the defendant in a criminal prosecution in the singular: "the accused shall . . . ." It is this same *accused* (understood) who is entitled to be informed of the nature and cause of the accusation; "to be confronted by the witnesses against *him*"; to obtain "witnesses in *his* favor," and the "Assistance of Counsel for *his* defense" (emphasis added). On the other hand, the First Amendment by its specific language (assembly, petition for redress) or its clear intent, protects certain freedoms of "the people" or special classes thereof, in a collective sense.

I would not be understood to suggest that individuals are any the less protected than their class as a whole under the First Amendment. Nevertheless, the different styles in which the two amendments are drafted points up the striking differences in the status of those affected by the First on the one hand, and

the Sixth on the other. An accused, far more often than not, stands alone, while the public—as spectator to his plight—may well be hostile to him if the charge involves a particularly vicious crime of violence or has some other sensational aspect. The so-called presumption of innocence is, I fear, all too often regarded with cynicism; a charge alone is, I suspect, all too often enough to generate a presumption of guilt rather than innocence.

Yes, an accused stands alone. Seldom, with a scattered handful of notable and magnificent exceptions,[3] will he find any one or more persons who will rally behind him. Moreover, an accused has the full panoply of the state, county, or municipal law enforcement and prosecutorial resources arrayed against him.

To me, there is no constitutional right more sacred than that of an accused in a criminal case to receive a *fair* trial; as a corollary, there is no greater moral and legal duty on the courts than to employ every device at their disposal to insure that the right is fully protected. This duty is ill-served by reliance on such purely subjective legal placebos as "substantial probability," "reasonable likelihood," and others, which lie within the capacity of judicial genius to create as escape routes from the obligation of doing justice in fact in difficult situations.

The spectacle of an accused, entitled legally to be presumed innocent, standing alone in a network of technicalities, should stir the conscience of everyone regardless of how case-hardened and cynical they may have become. In my judgment, the First Amendment rights of the media, as truly important as they are, pale in comparison. The time is now to look askance at the primacy and the favoritism, extended to the media, which shows through in too many judicial opinions dealing with the problems attendant upon freedom of the media versus fair trial. To lapse momentarily into the colloquial, too many of those opinions are just "plain phoney."

These opinions come into existence as a result of a number of factors. Among them is a seriously misguided sentiment that, except in very rare cases, primacy should be awarded to the media; rationale based, in part, on an exaggerated claim of pub-

---

[3] Vide the Sacco-Vanzetti case in this country, and the Dreyfus "affair" in France.

lic interest, pure theory, based in turn on speculation, claimed probabilities, and thinly disguised guesswork. An infamous burden is placed by the courts on the accused to demonstrate the virtually impossible, namely that access to the material before trial by the media *will* be prejudicial. This difficulty simplifies the ability of a court, with piously lifted eyes, to deny motions for sealing, closure, and the like, because of a defendant's failure to satisfy the evidentiary burden placed on him, and provides a false justification for denial rulings.

In the case of an individual charged with a criminal offense, the problem of a fair trial is singularly his alone. If the offense with which he is charged, and presumed innocent until convicted, has sensational aspects, the media frequently whips up public feeling with dramatic headlines, details of the crime, interviews with officials and with others directly or indirectly involved, and the publication of pretrial documents, investigatory and other records like those relating to the case before us.[4] An accused may even be confronted, figuratively at least, by a lynch-mob psychology as he is transported to and from the place of trial, and which can, and has, rubbed off on jurors and even the bench itself. Anyone familiar with the notorious Lindbergh kidnapping and child-murder case in New Jersey in the 1930s has good reason to question the fairness of the defendant's trial. A similar public outrage, based primarily on publicity, permeated the "sensational" Leopold-Loeb murder case in Chicago in the 1920s; the attorney for the defendants recognized that his clients had no chance of acquittal by a jury and that a death sentence would most certainly follow. Accordingly he persuaded them to plead guilty and relied on his powers of persuasion to convince the court to impose life sentences instead.

I reiterate: There is nothing more sacred than the constitutional right to a *fair* trial; there is too much at stake within the ambit of justice to be otherwise. The courts have a high degree

---

[4] Media sensationalism often feeds on itself. Once public opinion and sentiment has been stimulated by reportorial techniques, the media frequently continues "the good thing" it has created, rubbing its hands in glee and sends its minions abroad to report at length on the opinions of various "experts" and other sources, on the possibility of a fair trial in the light of the very publicity the media itself has generated.

of responsibility to use every device at their command to protect that right, even at the expense of media freedom because, and I reiterate, an individual, per se, is *always* involved, and there is no one more helpless than the individual, guilty or innocent, caught in the toils of the law. We must not, with a sly wink in the direction of the media, invite comparison with the arachnids, saying: "Won't you walk into my parlor," as the spider said to the fly.

I say that the burden of proof placed on defendants by the majority, to establish prejudice, is all but impossible to satisfy, and is now made even more difficult by the standards and guidelines established today by majority fiat. This is for the very simple reason that no one is psychic, no one can predict with absolute certainty, before the fact, what will or will not prejudice the fair-trial right of a defendant.[5] If the learned graybeards peering into their crystal ball decide that the publicity before trial, following disclosure, will *not* be prejudicial, and jurors are in fact influenced thereby to the ultimate detriment of a defendant, then, that is a lynching! Or at least a drumhead proceeding.

If a burden is to be placed anywhere, let it be on the media to demonstrate that the material demanded for publication before trial will *not* prejudice the accused. I do not, however, have my head in the clouds as does the majority. I recognize that placing the burden on the media is equally difficult, but what are we talking about here? We are talking about the right of an *individual* to a fair trial *in fact*.

In the case before us, which is typical, the accused did not invite the media to participate, nor was the latter under the slightest obligation to do so. It intruded, regardless of its right, entirely as a matter of its own discretion and judgment. In doing so, however, it trapped the accused into two battles instead of one. If the case against him had not been dismissed, he would have had to employ his time, attention, and efforts in fighting a

---

[5] The media-appellants recognize the difficulty but put a back-spin on the ball, criticizing the trial court's orders as based upon "presumed damage and not actual damage of defendant's rights." Very conveniently, of course, it evades the real issue of how a defendant can *ever* prove the "reasonable probability" of the "actual" damage which will result from an act that has not yet happened. This is an inappropriate attempt to apply tort language.

sort of subcase, before he could finalize his underlying case and defend himself; efforts which are almost inevitably hopeless and futile; "All hope abandon, ye who enter here!"[6]

I have agreed to an arguendo assumption that the rights of the media-appellants under the First Amendment were violated. I added, however, that, standing alone, that was irrelevant, unless addressed in the context of the rights of accused to a fair trial under the Sixth Amendment. Thus, it is obvious that the violation of the rights guaranteed by either of the two amendments, standing alone, is *not* the determining issue.

The true issue here has three prongs: first, does the constitutional freedom of the press conflict with the defendant's equally constitutional right to a fair trial under the Sixth Amendment? Secondly, if there is a conflict under the facts of this case, can it be reconciled, or, in other words, rendered harmless to the point that, in effect, the conflict no longer exists and both rights are accommodated? Finally, if the conflict cannot be reconciled, which one of the two conflicting constitutional rights has primacy?

The greatest danger encountered in fair-trial versus media cases is the possibility that the jurors will have been so influenced by pretrial publicity that they have become irredeemably biased or prejudiced against an accused. This Court has, in the *past*, spoken out often and sternly of its sensitivity and concern for the rights of defendants to a trial by an unbiased jury. It is a right which may be waived only by the accused *personally*, and only by a *knowing and intelligent waiver*. State v. Bailey, 144 Vt. 86, 102, 475 A.2d 1045, 1054 (1984). This Court has a *duty* to set aside a guilty verdict when the record discloses even a *possible* infringement of his right to a jury untainted by *any suspicion* of extraneous influence. State v. Woodard, 134 Vt. 154, 158, 353 A.2d 321, 323–24 (1976). The test for jury prejudice, through extraneous influences and considerations, is *not* whether such irregularities actually influenced the result, but whether they had the *capacity* for doing so. *Id.* at 156–57, 353 A.2d at 323 (quoting State v. Ovitt, 126 Vt. 320, 324, 229 A.2d 237, 240 (1967)).

---

[6] Dante, "Inferno" canto III.

It is clear, by the strategy it employs in reaching its decision, that the majority recognizes that defendant's Sixth Amendment right to a fair trial was actually or potentially violated. If that were not so there would have been no need to undertake the laborious reconciliation route it pretends to follow. The opinion commences, for all practical purposes, by announcing its intent to *balance* the First and Sixth Amendment rights involved and thus determine primacy. This is just another way of saying that the opinion seeks to *reconcile* the differences. There would be nothing to reconcile or balance if there was no conflict; primacy would be self-determining.

Be the above as it may, the majority moves on with its balancing pretense by mounting the battlements of its ivory tower where, notwithstanding our holdings referenced above, that the test for jury prejudice is *not* whether irregularities *actually* influenced the result, but whether they had the *capacity* to do so, *State v. Woodard*, 134 Vt. at 157, 353 A.2d at 323, it substitutes theories involving abstract speculation, guesswork and, as noted earlier, semantics, in the form of purely subjective legalistic placebos to ease its conscience, and places an all but impossible burden on the one who is the most in need of protection. The real world of practical experience and common sense lies so far below that it is out of sight of those above; their legalistic formula-ridden sport is never disturbed.

Essentially the majority recite two devices for use by the trial courts when balancing First and Sixth Amendment rights. Most unhappily for any fair trial expectations, they are all so heavily weighted against defendants in criminal matters that the result in all cases, except a rare few in the most exaggerated and unlikely circumstances, is guaranteed to the media. What an insult to, and a mockery of, justice! It is not a balancing in any real sense, any more than if a 250 pound man is weighed against a 10 pound baby to determine which one is the heavier. As a matter of reality, is there any doubt at all as to which end of the scale will make down weight? Of course not; nor is there any doubt here as the majority engages in its pretense of balancing.

The first device championed by the majority is a change of venue. I find it hard to believe that this hoary old chestnut is still taken as seriously as it might have been in the dear dead

days beyond recall, before news gathering and almost instant dissemination to the public moves as rapidly as it does today.

Chief Justice Allen, concurring in *State v. Tallman*, 148 Vt. 465, 476, 537 A.2d 422, 429 (1987), was squarely on target when he quoted from *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979) (emphasis added):

> The danger of [pretrial] publicity . . . is particularly acute, because it may be difficult to measure with *any* degree of certainty the effects of such publicity on the fairness of the trial.

I would go even further than the Chief Justice and recognize that, as a practical reality, it is more than difficult, it is *impossible*, even *after the fact*, to say nothing of *before* the publicity is released, to measure its effects on the fairness of trial.[7]

The whole "favored nation" treatment—to borrow a phrase—afforded the media by the courts, and denied to criminal defendants in these cases, is unfair beyond comprehension. Not only is the burden placed on defendants almost impossible to satisfy before the fact, but there is no way by which the human mind can *ever* determine, with the slightest degree of certainty, that advance publicity did not, in any way, prejudice the fair trial rights of a defendant who, by the way, is still *presumed innocent* at the time the challenged information is made public. I believe the applicable phrase is "black comedy," that is, the "humor" typical, for example, of the cruel practical joker, or cynic, who arrogantly makes sport of the frailties of the human condition. Thus, in A Midsummer-Nights Dream, III, ii, Puck, who is a champion among practical jokers if ever there was one, mocks, "Lord, what fools these mortals be!" and later, the duke comments on a tragic love affair as "very tragical mirth. Merry and tragical!" *Id.* V, i. Shakespeare has a phrase for all occasions!

As noted above, the defendant did not invite the media to intervene. It was entirely the appellants' decision. Why, in the

---

[7] The dangers to defendants inherent in pretrial publicity through the media are two-fold: first, publication of the material itself as it is baldly stated, and second, the manner in which it is presented through editing, creative writing and other elements of composition prior to publication, which can never be anticipated.

name of fair play and reason, should the serious, complex and worrisome problems which already confront defendant in preparing to defend himself be doubled by placing the impossible burden of *proving* the impossible, in a matter wholly collateral to the underlying case, on the defendant? It is the media, not the defendant, which is responsible for enmeshing the latter in two separate litigation problems rather than the one he anticipated. Why is it any more difficult for the media to demonstrate that publicity will not prejudice the defendant than for the defendant to prove that it will? One can never say, with the slightest degree of certainty, that publicity did *not* result in prejudice.

It is unconscionable to place the burden of going forward on a defendant in a collateral phase of his case, which he did not institute and for which he is in no way responsible or accountable. This seems inappropriate, if for no other reason than the virtual impossibility of satisfying the burden. The burden is made doubly onerous when we consider that the defendant has no way of knowing the exact form pretrial publicity will take until it is too late, or how the publicity will be written. Will it be, perhaps unintentionally, slanted, or some aspects thereof omitted from the publicity to the detriment of the defendant? I conclude, therefore, that a mere change of venue, as suggested by the majority as an appropriate protective device, particularly in a state as small as Vermont, coupled with placing the burden on a defendant to show that publicity *will* be prejudicial, is grossly unfair and an improper solution to the conflict of rights problem. It is, in fact, no solution at all; it serves only as a guarantee that the First Amendment rights of the media will inevitably be favored by this Court; and a defendant's right to a fair trial ignored, or favored with pietistic lip-service only, as seems to be the case here.

Vermont is one of the smallest states in the union, both in population and area. This is not California, New York, Illinois, Texas, Florida or New Jersey, among others, where either or both area and population far exceed ours. Although it is questionable, even in those jurisdictions, particularly in sensational cases, a change of venue *might* be a more arguably efficacious alternative. Nevertheless, to compare little Vermont to these states in order to justify a venue change here as a resolution to

the conflict of rights is laughable, albeit, "very tragical mirth." Statewide coverage, at least of sensational matters, is inevitable. Even if the extent of media coverage may lessen with distance, be assured it will revive and expand in the new venue to which the case has been transferred, once the change is made and becomes public knowledge.

The second device suggested by the majority as insuring that all jurors are free of any bias or prejudice against an accused resulting from pretrial publicity is the voir dire. The opinion speaks with laudatory enthusiasm—about as naive and credulous as anyone can get, especially one trained in the law and with even a minimum of trial experience—for the ability of clever and experienced trial counsel to separate out the wheat from the chaff when testing the qualifications of those summoned as prospective jurors.

The essential difficulty with the voir dire claim is, as in the change of venue theory, its remoteness from the slightest conformity with reality. For reasons that I can account for only as expediency in smoothing the path of media interests, the majority speaks glowingly of what a skillful attorney can accomplish on voir dire. This takes for granted as a given fact that the defense bar—to a man—consists of Clarence Darrows or better; *highly* competent, *highly* skillful, infallible judges of human nature, and all prospective jurors are bumbling idiots and trembling putty in the hands of these paragons of defense advocacy. My repetition grows tiresome, I'm sure, but what else can I say than that this is patently unfair, inexcusably slanted theorizing that has nothing whatever to do with reality.

I do not intend to demean the defense bar or the bar generally. The problem is simply that the majority opinion indulges in the convenient assumption that attorneys who represent criminal defendants are an organization of mind-reading supermen, skilled and qualified at an impossibly high level, thus permitting the opinion to stress relentlessly and repeatedly the First Amendment rights of the media, at the same time it speaks of what *skilled* counsel may be able to accomplish on voir dire.

The opinion quotes from *Press-Enterprise I* to the effect that the *First* Amendment rights cannot be overcome by mere conclusory assertions relating to the fair trial rights of a defendant. It is not necessarily impressive that it is the United States

Supreme Court being quoted. Are media assertions that publicity, which does not even exist at the time of suppression hearings, any *less* conclusory or purely subjective? The opinion continues, (quoting the Third Circuit in *United States v. Martin*, 746 F.2d at 973), "[T]esting by *voir dire* remains . . . [an] *effective* means of determining a juror's impartiality and assuring the accused of a fair trial." This is an unfortunately unfair, self-serving statement, slanted entirely to favor the media and the majority decision. It is *impossible* to say in any case whether the voir dire has or not been effective to disclose any juror bias or prejudice. *Martin* is no more than wishful thinking at a high level.

Where is the empirical evidence which supports this blandly asserted effectiveness? There is none. The majority is quick enough to castigate the defense for an insufficiency of evidence; in fact, the evidence is insufficient *only* because the majority says it is. It is more than adequate, and once more we see favoritism.

I return again to the injustice of placing the burden on the defendant to show that disclosure will prejudice his right to a fair trial. There is no "balancing" involved in this, yet it would be no more onerous to assign the burden to the media. It is the media, after all, who want certain materials. Nor does the majority suggest how anyone can *ever* establish with any assurance to the defendant that disclosure or access cannot possibly prejudice his case. The unfortunate truth is that *no one can ever possibly know.* Therefore, if a defendant is convicted, he may, for all anyone knows, languish in prison or, in some states, lose his life, because of well-concealed jury bias, while the media, the courts and the world at large move on indifferently. All the more infamous is this injustice when a defendant has been unable to satisfy the burden so casually placed on him, when an honest comparison of rights should satisfy any fair-minded and justice-sensitive person that the burden should lie with whoever wants access, including the media, to demonstrate, if they can, that disclosure will *not* jeopardize the defendant's right to a fair trial—one of the most fundamental rights guaranteed to the individual as such.

As the majority opinion is structured, it tells defendants, "We will see that you have a fair trial *provided,* of course, it doesn't

get in the way of the media. Otherwise, sorry, any guarantee of a fair trial, per se, is irrelevant." The fair approach should be to say to the media, "You ask for access to certain pretrial material, and defendant objects on the grounds that the release and publication of this material may be prejudicial; you have the right of access and publication provided you establish that it will *not* prejudice the defendant's right to a fair trial."

There was a time, I think, when the courts took pride in guarding the "individual" against the incursions of the powerful. Now, it seems, that pride was timorous, a jerry-rigged vessel which comes unstuck all too easily.

As a practical matter, it is virtually impossible to "prove" the effect of something that has not even happened, except by unmitigated guesswork, speculation and crystal ball-gazing. I would, therefore, favor even the most revolutionary concept, as I am sure it will be regarded, that the motions like those made by defendant here should be granted as a matter of right. I can think of no other way to insure with any certainty that defendant's right to a fair trial could not be endangered by pretrial prejudice against him on the part of any prospective jurors as a result of foreknowledge engendered by publicity.

The familiar arguments made by the media, that publicity enables the public to monitor its courts and the judicial process, are the clawings of a paper tiger, shadow without substance, bordering on the outright silly. There is very little, if anything, of importance in pretrial material that does not become manifest at trial. On the one hand, the courts "pretend" to favor juries with as little foreknowledge as possible, as insurance against any pretrial mind-set prejudicial to a defendant. On the other hand, these same courts encourage and protect even the most detailed, repetitive and continuing publicity generated by the media, which, even at its best, gives rise to uncertainty, and then, cynically, places the "burden of proof" on the hapless defendant to *establish* the likelihood of prejudice, citing such patent-medicine-show cure-alls as venue changes and the voir dire—Janus incarnate.

Motions such as those filed here are generally initiated by defendants. There might be grounds for considerable caution in those rare cases where similar motions are originated by the State; there is no similar caution warranted in granting pretrial

sealing and suppression motions involving media publicity filed by the defense.

Except as otherwise noted herein, I must reluctantly include in this dissent those lines of the concurring opinion which condone placing the burden of proving the virtually impossible on defendants in these cases. I have explained my reasons above.