2012 VT 92

### In re Essex Search Warrants

[60 A.3d 707]

No. 11-228

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 9, 2012

*William H. Sorrell*, Attorney General, and *John Treadwell*, Assistant Attorney General, Montpelier, for Appellant State of Vermont.

*Dan Barrett*, Montpelier, for Amicus Curiae American Civil Liberties Union Foundation of Vermont.

*Adam Silverman* and *Sam Hemingway* of *The Burlington Free Press*, Pro Ses, Burlington, Appellees.

¶ 1. **Burgess, J.** The State appeals from the Chittenden Criminal Division's denial of its motion to seal search warrants and related materials generated during an ongoing investigation into a missing Essex couple. The court determined that the State failed to show with specificity, as required under *In re Sealed Documents*, that disclosure would cause "substantial harm to public or private interests." 172 Vt. 152, 153, 772 A.2d 518, 521 (2001). The State asserts foundationally that there is neither a First Amendment nor a common law right of access to search warrant materials in an active, pre-arrest investigation, and argues that *Sealed Documents*' presumptive right of access should not apply in such cases. Instead, the State urges this Court to hold that there is no right of access to such materials under the Vermont Rules for Public Access to Court Records (PACR Rules). Assuming that *Sealed Documents* applies to pre-arrest investigations, however, the State claims error in the court's conclusion that the standard for sealing was not satisfied. Finally, the State asserts that the court erred in turning down its request for an evidentiary hearing. We see no error in the court's refusal to conduct a further hearing, but reverse its determination that the State failed to cite sufficiently specific reasons to seal the warrant information.

¶ 2. Despite ·the dissent's hyperbole, this holding meets the facts of this particular case, and presents no reversal, let alone defiance, of our case law or rules. *Post*, ¶ 42. Just because application of *Sealed Documents* does not yield the result preferred by the dissent, it signals no departure from the requirement of specific and compelling reasons for sealing search warrant documentation from public inspection. *Id*. Nor does it follow that

the balance between presumed public access and necessary confidentiality in ongoing police investigations is torn asunder, *id.*, rather than confirmed as provided for in the PACR Rules. See V.R.P.A.C.R. 6(a), (b)(15) (providing for general public access to "case records" subject to exemption for "[r]ecords of the issuance of a search warrant," until the warrant's return, unless sealed by the court).[1] Correctly describing its difference with the majority as over the meaning of the standard in *Sealed Documents*, the dissent then incorrectly characterizes the majority's reading of the case as a "change" in that standard. *Post*, ¶¶ 52, 55.

¶ 3. William and Lorraine Currier of Essex, Vermont were reported missing on June 9, 2011. The Curriers were last seen on June 8 leaving work, and evidence suggests that they were at their home at 8 Colbert Street in Essex at around 7 p.m. that night. The couple's abandoned car was found on June 10 less than a mile from their home.

¶ 4. Essex police obtained a series of search warrants from the Chittenden Criminal Division as part of the investigation into the Curriers' disappearance. On June 15, a *Burlington Free Press* reporter requested from the court copies of the search warrants issued for the Curriers' home and car, as well as their cell phones, bank account, and credit card receipts. The court denied the

---

[1] In her concurrence, Sister Skoglund would have us look to the separation of powers doctrine, deference to legislative policy decisions and comity with the executive's law enforcement function to avoid applying the judiciary's PACR Rules in a manner contrary to the Public Records Act, 1 V.S.A. § 317(c)(5), exempting criminal investigation records from the public's right to disclosure. That the judiciary should not gratuitously interfere with the shared and valid objectives of the legislative and enforcement branches is a legitimate concern. See V.R.P.A.C.R. 7(a) (providing a process for courts to open a case record "to which access is otherwise closed" upon a showing of good cause and exceptional circumstances, except that "[i]f a statute governs the right of public access and does not authorize judicial discretion in determining to open or seal a record, this section shall not apply to access to that record"). Whether § 317(c)(5) of the Public Records Act is such a statute, or whether there is merit to the separation of powers approach, neither was raised below and so we decline to consider it on appeal. See *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) (observing that arguments not made to the trial court "are not preserved for appeal"). As for the dissent's concern that Justice Skoglund's appeal to comity is somehow submissive to an executive "seeking to force its choice on the judiciary," *post*, ¶ 62 n.21, there is no issue of force at all; there would be only the question of whether the judicial branch *agrees* with the legislative and executive branches on the confidentiality of investigation records.

request because the search warrant returns had not yet been filed. On June 16, the State moved "to seal search warrants, applications for search warrants, and affidavits filed in support of the search warrants, that were filed in connection with the [Currier] investigation." The court denied this motion, again citing the fact that the search warrant returns had not been filed.

¶ 5. On June 21, Essex Police filed returns for four of the search warrants executed during the Currier investigation, as well as inventories and affidavits filed in support of the warrants, and the State renewed its motion to seal the search warrants.[2] At the time of the State's renewed motion, no arrest had been made in connection with the Curriers' disappearance. The court denied the State's motion, requesting more information about how disclosure of the search warrant materials would harm the investigation, such as what facts remained known only to police and any putative suspect and how this balance of information was useful to the investigation.

¶ 6. The State responded with a supplemental renewed motion to seal. This motion, supported by the affidavit of Essex Police Detective Lawton, listed the information contained in the search warrants believed to be known only to police and any putative suspect in the Curriers' disappearance.[3] The State specified that

---

[2] Although eleven search warrants had issued at the time of the State's renewed motion to seal, the State's motion covered only the four warrants and related materials that were filed with the Chittenden Criminal Division on June 21, 2011: one signed by Judge Dennis Pearson on June 9, 2001 for the Curriers' home, two signed by Judge James Crucitti on June 10, 2011 for a dumpster in Essex and the Curriers' car, respectively, and one dated June 14, but signed by Judge Thomas Devine on June 16, 2011 for Mr. Currier's work locker at the University of Vermont.

[3] Examination of the Lawton affidavit reveals that at the time of the State's renewed motion to seal, there was a significant amount of information obtained during the Currier investigation that had not been made public. Specifically, the affidavits filed in support of the search warrants detailed the condition in which the Currier home was found, including certain damage, the whereabouts of some of the couple's personal effects and the absence of others, as well as their ownership of a particularly described weapon and its absence. Additionally, the Lawton affidavit states that the public had not been told of several items found at the Curriers' home that were listed in the search warrant inventory, including a certain item that could relate to the condition of the house or its entry. It notes that the affidavits supporting the warrants for the Curriers' car and dumpster revealed the police's theory about the couple's travel on the day they disappeared. It also describes items collected during the search of the Curriers' car and Mr. Currier's

disclosure of search warrant materials would frustrate police evaluation of the credibility of citizen reports by comparison against information known only by police. The Lawton affidavit further posited that because police did not know whether the information collected was relevant to the Curriers' disappearance, or how so, disclosure of the search warrants "would significantly hamper" the investigation by "allow[ing] a suspect to easily avoid detection and/or respond to police questioning. . . . unduly influenc[ing] the recollection of true witnesses, or allow[ing] any false witnesses to tailor information to fit with what is already known by police." The State also suggested redaction of the nonpublic information contained in the warrant materials as an alternative to sealing, though it questioned whether redaction would be practical in this case.

¶ 7. The court again denied the motion and ordered that the search warrants be released. The court reasoned that *Sealed Documents* created a presumption in favor of disclosure that the State failed to overcome with "compelling reasons" showing "substantial harm, demonstrated with specificity with respect to each document." The court characterized the State's arguments in support of sealing as "only general assertions that the police investigation will be jeopardized if the [search warrants are] released."

¶ 8. The State then requested a stay until an evidentiary hearing could be held at which Essex Police could testify in support of sealing and the State could argue for redaction. The court refused to grant a stay, explaining that the State proffered no additional information to what had already been offered. The State appealed and requested a stay pending appeal, which the court also denied. This Court, however, granted the State's motion for a stay pending appeal, explaining that denial "would effectively preclude the State from appealing the criminal division's decision and potentially hamper its investigation." *In re Search Warrants*, 2011 VT 88, ¶ 3, 190 Vt. 572, 27 A.3d 345 (mem.).

¶ 9. While this appeal was pending, a suspect in the disappearance of the Curriers was taken into custody and the State withdrew its motions to seal the search warrants and related

___

work locker that had not been released. Finally, it explains that the search warrant returns and inventories for the dumpster and Mr. Currier's work locker reveal the results of those searches, to which the public had not been privy.

material that form the subject of this appeal. Consistent with this action, the Attorney General informed the Court of his position that all of the material in question should be available to the public. Upon request by the *Burlington Free Press*, this Court ordered the release of the material and, in a separate order, directed the parties to show cause why the appeal should not be dismissed as moot. Both parties responded that, while technically moot, the appeal should be decided nevertheless under the settled exception for cases "capable of repetition, yet evading review." *State v. Tallman*, 148 Vt. 465, 469, 537 A.2d 422, 424 (1987) (quotation omitted). We agree.

¶ 10. The applicability of this particular exception turns on a two-part test: "(1) the challenged action must be in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there must be a reasonable expectation that the same complaining party will be subjected to the same action again." *Id.* (quotation omitted). We have applied the exception on at least two occasions to address the propriety of orders sealing documents in pending criminal matters where the underlying criminal cases resolved during the pendency of the appeal. See *State v. Schaefer*, 157 Vt. 339, 345, 599 A.2d 337, 341 (1991) (applying exception to rule on propriety of order sealing affidavit of probable cause, despite dismissal of the criminal case during appeal); *Tallman*, 148 Vt. at 469, 537 A.2d at 424-25 (applying exception to address validity of order sealing affidavit of probable cause and closing suppression hearing to the public, although defendant was acquitted during pendency of appeal). As observed in *Tallman*, pretrial orders of this nature tend to be "short-lived," and news organizations challenging such orders could reasonably expect to be subjected to similar restrictions in the future. *Tallman*, 148 Vt. at 469, 537 A.2d at 424-25 (citation and quotation omitted).

¶ 11. As events here demonstrate, the orders at issue in this case are of a similar nature. With the arrest of a suspect, the State's rationale for sealing the search warrant materials and the stay order preventing their disclosure consequently became moot. It is reasonable to expect that this chain of events would likely occur in any future investigation involving pre-arrest search warrants. It is equally reasonable to expect that the State and the media will confront each other again over the same issue in the future, but be frustrated, due to recurring mootness, in their

effort to obtain a final judicial determination of their respective obligations and rights relative to public access to these kinds of records.

¶ 12. Furthermore, as explained below, while this case ultimately turns on the application of the *Sealed Documents* standard, it also depends upon the meaning of that standard and its interplay with the PACR Rules. That these are matters of legal, rather than factual, contention yet to be resolved by this Court militates in favor of review, as well. See *Schaefer*, 157 Vt. at 345, 599 A.2d at 341 (finding that the appeal raised unresolved legal questions about the proper standard to apply in balancing the right to a fair trial against the right to access, while cautioning that as legal issues are resolved cases "will become more fact specific" and the legal issues less likely to recur or evade review in the future); cf. *State v. Rooney*, 2008 VT 102, ¶ 15, 184 Vt. 620, 965 A.2d 481 (mem.) (declining to address a moot order where "the applicable legal standard has already been decided in previous cases, and our analysis, were we to reach the merits, would be wholly factual"). As the following discussion and vigorous dissent make clear, the question of how the *Sealed Documents* decision governs disclosure of warrant documents vis-à-vis PACR Rules 6(b)(15) and 7(a) presents an issue of first impression not already decided. Accordingly, we conclude that this appeal satisfies the criteria for review under *Tallman*.

¶ 13. The State preliminarily asserts that there is neither a First Amendment nor a common law right of access to search warrant materials when, as here, an investigation is active and no arrests have been made. *Sealed Documents* declined to address these issues, 172 Vt. at 156, 772 A.2d at 523, and we need not reach them here because the State did not raise them below. See *In re Shenandoah LLC*, 2011 VT 68, ¶ 18, 190 Vt. 149, 27 A.3d 1078 (explaining that issues not argued below are not reviewable on appeal). For the same reason, we also decline to consider the State's argument that *Sealed Documents* should not apply in active, pre-arrest investigations.[4] See *id.* Rather, our decision

---

[4] The State made its most complete argument below in its Supplemental Renewed Motion to Seal. The State's motion did not argue that *Sealed Documents* should not apply in active, pre-arrest investigations, but rather that its criteria for sealing were met in this case.

today is limited to whether the *Sealed Documents* standard for sealing was satisfied under these facts.[5]

¶ 14. We review the court's decision on the motion to seal for abuse of discretion. See *Sealed Documents*, 172 Vt. at 163-64, 772 A.2d at 528 (explaining that on remand "[t]he court shall determine in its discretion whether and to what extent the contents of each document shall be protected under seal"). "[A]n abuse of discretion is the failure to exercise discretion or its exercise on reasons clearly untenable or to an extent clearly unreasonable." *State v. Amler*, 2008 VT 1, ¶ 5, 183 Vt. 552, 944 A.2d 270 (mem.) (quotation omitted). "When a trial court commits an error of law, it is an abuse of discretion." *Spooner v. Town of Topsham*, 2010 VT 71, ¶ 7, 188 Vt. 293, 9 A.3d 672.

¶ 15. Reiterating points made below, the State maintains that sealing or redaction is justified under the *Sealed Documents* standard. It argues that disclosure of the search warrant materials would substantially threaten the Currier investigation by depriving police of the use of nonpublic information to, among other things, identify possible suspects, corroborate new information, and recognize false confessions. The Lawton affidavit, the State continues, identifies with requisite specificity the nonpublic information which, if disclosed, would threaten these law enforcement interests. These interests are not unimportant, and we hold that the trial court abused its discretion in concluding that the State's proffer and argument failed to meet the specificity requirements of *Sealed Documents* to authorize sealing certain search warrant records in this ongoing investigation.

■ ■ ¶ 16. We start with the PACR Rules and *Sealed Documents*. Rule 6 governs public access to "case records" and Rule 6(a) provides for access to "all case records," subject to the exceptions enumerated in Rule 6(b).[6] Rule 6(b)(15) excludes from public access "[r]ecords of the issuance of a search warrant, until the date of the return of the warrant, unless sealed by order of the court." This exception covers not only the record of the

---

[5] We thus leave for another day the question of whether *Sealed Documents*, or some other standard, best balances the public access and law enforcement interests at stake in active police investigations prior to charges being filed.

[6] Just as we assume that *Sealed Documents* applies to active, pre-arrest investigations, we also assume, without deciding, that search warrant materials in pre-arrest investigations are "case records" within the meaning of the PACR Rules.

issuance of a search warrant, but also related materials, such as the application, supporting affidavit and inventory. See *Sealed Documents*, 172 Vt. at 158, 772 A.2d at 524 (explaining scope of Rule 6(b)(15) based on Court's decision in *Tallman*); see also *Tallman*, 148 Vt. at 472-73, 537 A.2d at 426-27 (holding search warrant affidavit is subject to disclosure under statute providing for public access to "records of the court"). *Sealed Documents* spelled out four conditions precedent to sealing a search warrant and related material, requiring that an order to seal must "determine specifically what information should be sealed and why." 172 Vt. at 162, 772 A.2d at 527.

■ ■ ¶ 17. Assuming, without deciding, the dissent is correct in its claim that Rule 7(a) is "the governing rule" in this case, *post*, ¶ 49,[7] we do not read it to establish a standard more demanding than *Sealed Documents*. To begin with, nothing suggests that the criteria of *Sealed Documents* are inadequate to serve and protect public access to court records. Indeed, Notes to Rule 7(a)

---

[7] This claim is only arguable. Rule 4 declares a general policy of open case records, "[e]xcept as provided in these rules." Rule 6(a) reiterates this open records policy, "except as provided in subsection (b) of this section." Subsection 6(b)(15), in turn, excepts search warrant records up to the warrant's return date "unless sealed by order of the court." The "fairly uniform common-law standard under which a court may seal" warrant records under Rule 6(b)(15) was adopted and established in *Sealed Documents*. 172 Vt. at 161, 772 A.2d at 526. On its face, and as explained in detail in the Reporter's Notes, Rule 7(a) "states an exception to the general access policy stated in § 4 of these rules" by authorizing courts "to allow access to an otherwise closed record or to seal, or redact information contained in, an open record" upon finding "good cause specific to the case" and "exceptional circumstances."

If, as the dissent assumes, this is a more demanding threshold than the common law of *Sealed Documents*, it may be because the additional Rule 7(a) exception "permits the court to use its discretion when addressing *special situations that can not be anticipated and specifically dealt with in these rules.*" Reporter's Notes, V.R.P.A.C.R. 7(a) (emphasis added). Rule 7(a), then, would appear to be inapposite given that Rule 6(b) already anticipates and deals with the situation of sealing warrant records under subpart (b)(15), and the standard for doing so is already set forth in the common law of *Sealed Documents*. Thus, Rule 7(a) may not at all govern the question presented in this case. Moreover, while the Reporter's Notes — 2001 Amendment to Rule 6(b)(15) rightly advise that courts "must apply the standards contained in *In re Sealed Documents*" in deciding whether to seal warrant records, the same Note is arguably in error to assert that those records are available "unless sealed pursuant to § 7(a) of these rules" since Rule 7 is not plainly necessary to sealing warrants under Rule 6(b) and *Sealed Documents*.

repeatedly hold up *Sealed Documents* as a dissertation on a court's "authority to grant access to a closed record, to deny access to or seal an open record" and of "the standards and process necessary to exercise that authority." Reporter's Notes, Rule 7(a). Under *Sealed Documents*, and as more particularly reviewed below, warrant records may not be sealed unless the State can show a "substantial threat exists to the interests of effective law enforcement," with the "requisite showing of harm . . . demonstrated with specificity as to each document; general allegations of harm are insufficient." 172 Vt. at 161, 772 A.2d at 527 (emphasis and quotation omitted).

¶ 18. The import of these terms is further informed by the rationale summarized in our reversal of the trial court's decision to seal warrant records in *Sealed Documents* absent

> any evidence that it clearly placed the burden of *demonstrating a compelling need for confidentiality* upon the State; that it analyzed each document separately in light of the State's arguments; that it considered alternatives short of a blanket order of nondisclosure; or that it made any fact-specific findings determining *precisely what information contained in the disputed materials* would result in the *kinds of harm* advanced by the State.

*Id.* at 163, 772 A.2d at 528 (emphasis added). Rule 7(a) authorizes an order to seal "only upon a finding of good cause specific to the case before the judge and exceptional circumstances." The dissent apparently understands the rule to require more than the *Sealed Documents* standard.

██ ¶ 19. We disagree. The rule's test of "good cause specific to the case" and "exceptional circumstances" are practically indistinguishable from the "specificity" of harm presented by disclosure of particular documents, and that harm's "substantial threat . . . to . . . effective law enforcement" amounting to a "compelling need for confidentiality" demanded by *Sealed Documents* as a precondition to an order to seal. Compare V.R.P.A.C.R. 7(a) with *Sealed Documents*, 172 Vt. at 161, 163, 772 A.2d at 527-28. That the terms are synonymous is supported by the "policies behind this rule," V.R.P.A.C.R. 7(a), which, suggest the Notes, are reflected in "[t]he standards in *In re Sealed Documents* [that] will be particularly relevant in deciding whether to exercise the authority under this section." Reporter's Notes, V.R.P.A.C.R. 7(a). Nor can

it be reasonably said that the State's proffer in this case failed to specify actual risk of false leads, distractions and resulting interference with its ongoing investigation into the Curriers' disappearance, or that such impediments and the relinquishing of an informational advantage — evidently the only police advantage in this unusual case — would not compromise the investigation and so present a "compelling need for confidentiality" under *Sealed Documents* and an "exceptional circumstance" under Rule 7(a).

¶ 20. The PACR Rules incorporate *Sealed Documents* as the standard for whether the public should have access to search warrant materials.[8] See Reporter's Notes, V.R.P.A.C.R. 7(a). In *Sealed Documents*, the trial court sealed search warrant materials generated during the investigation of a New Hampshire murder for which two Vermont residents had been arrested, but not yet indicted by a New Hampshire grand jury. 172 Vt. at 154-55, 772 A.2d at 521-22. We reversed, holding that upon a search warrant's return, there is a presumptive right of access to the warrant and related documents "which are filed with the court, and which become a part of the case record." *Id.* at 159, 772 A.2d at 525. Drawing from the Washington Supreme Court's decision in *Cowles Publishing Co. v. Murphy*, 637 P.2d 966 (Wash. 1981), we further held that to overcome this presumption, the party opposing access must show that disclosure poses "a substantial threat . . . to the interests of effective law enforcement," or, where redaction is possible, that "these interests might be served by deletion of the harmful material." *Sealed Documents*, 172 Vt. at 161-62, 772 A.2d at 527 (quotation omitted).[9] These interests must be shown "with specificity as to each document," and general allegations of harm will not suffice. *Id.* at 161, 772 A.2d at 527 (quotation omitted); see

[8] In *Sealed Documents*, we interpreted the disclosure requirements of 4 V.S.A. § 693, which provided for public access to court records. See 172 Vt. at 156-60, 772 A.2d at 523-26 (interpreting former § 693). As part of Vermont's judicial restructuring in 2010, § 693 was replaced by 4 V.S.A. § 652(4). Section 652(4) bars disclosure of court records "required by law to be kept confidential." The PACR Rules, and thus *Sealed Documents*, now govern such disclosure. See *Sealed Documents*, 172 Vt. at 158 n.5, 772 A.2d at 524 n.5 (noting that PACR Rules would govern public access to court records after May 1, 2001).

[9] Where appropriate, individual privacy and safety must also be considered, but the State claims only law enforcement interests as the basis for sealing or redaction. *Sealed Documents*, 172 Vt. at 161, 772 A.2d at 527.

also *Cowles*, 637 P.2d at 970 (discussing common law right of access to search warrant materials). For its part, "the court must examine each document individually, and make fact-specific findings with regard to why the presumption of access has been overcome." *Sealed Documents*, 172 Vt. at 162, 772 A.2d at 527 (quotation omitted).

¶ 21. Here, the trial court failed to acknowledge or dispel what the State explained, as to each piece of information and document sought to be protected, to be a substantial threat to its Currier investigation resulting from disclosure of the materials withheld, so far, from the public. It is given that controlling access to information is an advantage that law enforcement must both protect and exploit.[10] In any case, and especially in the course of an active investigation, nonpublic information has a variety of uses, including enabling police to determine the relevancy or importance of information, to identify or exclude putative suspects, test theories, evaluate tips and claimed alibis, discover motives and conduct ruses. See F. Inbau, Criminal Interrogation and Confessions 11-12 (4th ed. 2001) (describing "fact analysis" used to identify probable criminal offenders); see also *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989) (concluding that "the common sense reason why proceedings for search warrants are not open to the public" applies when considering disclosure of search warrant affidavits); *Times Mirror Co. v. United States*, 873 F.2d 1210, 1215, 1218 n.11 (9th Cir. 1989) (explaining that with disclosure of search warrant affidavits in pre-arrest investigations suspects "might destroy evidence, coordinate their stories before testifying, or even flee the jurisdiction"). Neither the *Free Press* nor the court below rebutted, as unfounded or illogical, the State's assertion that lifting the police embargo on specific investigative results, before charges are filed, runs the risk of subjecting the investigation to wasteful diversions and distractions to the detriment of crime solving and, by extension, public safety. See Inbau, *supra*, at 11 (explaining that "fact analysis" is "utilized in such a way as to locate possible suspects and to help identify which one probably committed the crime").

---

[10] As Sherlock Holmes once explained, "It is of the highest importance in the art of detection to be able to recognize, out of a number of facts, which are incidental and which vital. Otherwise your energy and attention must be dissipated instead of being concentrated." Sir Arthur Conan Doyle, *The Reigate Puzzle*, in *Complete Sherlock Holmes* 459, 469 (1930).

¶ 22. The dissent complains that such issues are not "specific" as intended in *Sealed Documents* because they are common to investigations generally and are not "peculiar" to this case. Armed with dictionaries emphasizing "specific" as peculiar or exceptional, *post*, ¶ 48, the dissent ignores dictionaries of equal stature defining "specific" as "definite, explicit." Webster's New World Dictionary 1367 (2d College ed. 1979); accord The American Heritage Dictionary of the English Language 1240 (New College ed. 1979) (defining "specific" as "[e]xplicitly set forth; particular; definite"); see also Black's Law Dictionary 1406 (7th ed. 1999) (defining "specific" as "[o]f, relating to, or designating a particular or defined thing; explicit"). *Sealed Documents* refers not to unique, but specific circumstances to justify sealing. It may be that the same concerns raised by the State are common to cases as unusual as this where there are suspicions, but no apparent certainty about what has happened to the Curriers, the means of their disappearance or who might have been involved. If not unique, the actual risk of harm outlined by the State is no less real, and the objective of *Sealed Documents* was to avoid harmful interference with criminal investigations. The dissent contends, instead, that if not uniquely harmful, let the harm begin. *Sealed Documents* does not stand for that proposition.

¶ 23. Moreover, the dissent assumes much in contending that the reasons offered by the State for confidentiality in this case here are common to all open investigations. In any number of investigations involving search warrants, the offense is evident, the perpetrators are known, the implements identified, the underlying circumstances established and public disclosure of some or all of same may compromise nothing. Not every investigation is a "whodunit," but when search warrants are employed in an attempt to solve an actual mystery, the specific reasons given by the State for not publicizing the results of an investigation may indeed, as here, prove reasonable justification for avoiding diversion or frustration of the investigative effort.

¶ 24. Other courts recognize the necessity of preserving the confidentiality of certain information during a criminal investigation. For example, in *In re State (Bowman Search Warrants)*, the New Hampshire Supreme Court reversed the trial court's order to unseal search warrant materials in an ongoing investigation, reasoning that "[t]he threat to an on-going, pre-indictment criminal investigation . . . most often significantly outweighs any

possible benefits from public disclosure." 781 A.2d 988, 992 (N.H. 2001). The New Hampshire court explained that release of information contained in search warrant materials could harm ongoing investigations in many ways, such as by prompting suspects to destroy evidence, to fabricate stories to evade their own detection, or that of others, or by exposing the identity of witnesses, who may then refuse to cooperate for fear of reprisal. *Id.* at 992-93; see also *PSC Geothermal Servs. Co. v. Superior Court*, 31 Cal. Rptr. 2d 213, 223 (Ct. App. 1994) (recognizing that with disclosure of search warrant affidavits in pre-arrest investigations "[s]ubjects of such investigations might be alerted and impede the investigation by tampering with or destroying evidence").

¶ 25. Likewise, in *Seattle Times Co. v. Eberharter*, the Washington Supreme Court refused to grant public access to a search warrant affidavit in the ongoing investigation of a suspected serial killer. 713 P.2d 710, 717 (Wash. 1986). The trial court there, applying the same common law standard adopted in *Sealed Documents*, had sealed the affidavit to help facilitate the cooperation of informants associated with prostitution and to protect them against targeting by the killer. *Id.* at 711-12 (utilizing *Cowles* standard); see also *Sealed Documents*, 172 Vt. at 161-62, 772 A.2d at 527 (adopting common law standard for sealing of *Cowles*). Rejecting that there was a right to view the affidavit under either the Washington or federal constitutions, the Washington Supreme Court in part emphasized that with the disclosure of such information, "the public interest in discovering and capturing the perpetrator of a criminal act is compromised." *Eberharter*, 713 P.2d at 717.

¶ 26. As these cases recognize, and contrary to the suggestion of amicus American Civil Liberties Union, premature disclosure of search warrant materials can do more than just inconvenience the police. It could, according to the State, compromise the Currier investigation. Among other reasons specified to the court below, the State seeks to seal the search warrant materials precisely to allow police to accurately and efficiently analyze new information based on evidence obtained so far, to sift representations of purported witnesses, and to tell which facts are incidental and which vital. "Forewarned is forearmed," and the State explained its effort to seal particular information collected so as to deprive putative suspects the advantage of that adage and so avoid detection. See Inbau, *supra*, at 11 (emphasizing importance of

information analysis in identifying suspects). The State similarly posits that closely held information helps in identifying false confessors and screening out false leads. See *id.* at 432 (describing use of nonpublic information to verify confessions); see also *Cowles*, 637 P.2d at 969-70 (noting law enforcement interests at stake in a sealing decision). Arguing that disclosure is presumptively the better policy and echoing the trial court's characterization of the State's claims as merely possible, the *Free Press* does not refute the State's concerns or show the State's perceived risks to be unlikely.

¶ 27. The trial court's decision did not, ostensibly, consider the specific law enforcement claims of likely investigative interference. Instead, the court focused on the public's right to know about police activity and stated, only in conclusory fashion and without particular explanation, that release of the search warrant materials would not harm the investigation. To be sure, public access to records outlining the direction, strategy, results and progress or lack of progress in an ongoing investigation opens government wide to examination. See *Times Mirror Co.*, 873 F.2d at 1218 (noting that disclosure may indirectly deter police abuse of power). Nevertheless, it is unclear what that degree of openness achieves, at a price of compromised investigative integrity, that is not already generally secured by established constitutional safeguards against unreasonable search and seizure. *Id.* As the Ninth Circuit explained in *Times Mirror*:

> While public access would doubtless have some positive effect by increasing the flow of information to the public about the workings of the government and by deterring judicial and law enforcement officers from abusing the warrant process, the incremental value in public access is slight compared to the government's interest in secrecy at this stage of the investigation. This is particularly true given the other mechanisms — including suppression motions and civil actions for violation of constitutional rights — that are already in place to deter governmental abuses of the warrant process.

*Id.* The dissent's concern about secret warrants, *post*, ¶ 62, is farfetched when in all cases, such warrants are issued by independent, disinterested magistrates and, except in the rare instance

where the holders of the premises searched have vanished, the proprietors are free to publicize the warrant and the search.

¶ 28. The court's statement that "access can not cause interference with a *completed* search" apparently misapprehends the State's reasons for sealing, or dismisses those reasons without explanation and without weighing the full range of interests at play. See *Times Mirror Co.*, 873 F.2d at 1218 (discussing competing interests at stake in decision to disclose search warrant materials). The State's interest in investigative integrity did not end with the search, because its investigation is ongoing. Effective execution of past searches was not the issue before the court. The risk described by the State is not, as the trial court concluded, theoretical, but real. At stake, as set forth by the State, was the effectiveness of a still open investigation, and the potential mischief from disclosure of nonpublic information on future searches, tips, suspects, witnesses and the ability of police to gather, screen, identify and evaluate putative evidence.

¶ 29. Without elaboration, the court concluded that the State "made only general assertions that the police investigation will be jeopardized." This assessment does not comport with the State's claims of interference, which were specific on their face. Assuming the court considered the State's submission, it may have, like the dissent, misread *Sealed Documents* to condition sealing on a unique, rather than specific, showing of jeopardy and unique, rather than exceptionally compelling, circumstances. As pointed out earlier, however, specificity and exceptional do not mean rarity if the State can demonstrate specific risk of harm in the case before the court, and that harm is exceptional in the sense that it will nullify a police advantage and risk wasteful diversion and distraction of investigative resources.

¶ 30. That public disclosure of investigation strategy, tactics and results to date can commonly compromise police work does not make actual examples of such instances any less specific. The specificity called for in *Sealed Documents* means articulating concrete reasons for keeping certain information from the public eye and identifying how the breach of such confidentiality can undermine the integrity of the investigation. See *Sealed Documents*, 172 Vt. at 161, 772 A.2d at 527 (explaining that "the requisite showing of harm must be demonstrated with specificity as to *each document*" (quotation omitted)); see also *Cowles*, 637

P.2d at 970 (explaining that party seeking to seal search warrant "must state *specific reasons* for the need for confidentiality" (emphasis added)). Similarly, that the same kind of harm can derail or divert an investigation in more than one instance makes it no less compelling in the sense of *Sealed Documents*, where the harm to be avoided is an unjustified and needless frustration of investigators.

¶ 31. The State cited several concrete reasons for sealing in this case, such as enabling police to identify suspects, to evaluate the reliability and utility of new information, and to recognize false confessions. It explicitly linked these justifications with the discrete nonpublic information contained in the various search warrant materials referenced in the Lawton affidavit. The State's reasons for sealing may be common to all investigations, especially at the pre-arrest stage, but commonality renders the rationale no less specific. It may simply mean, as suggested earlier, that specific reasons satisfying *Sealed Documents* are inherent to active investigations where misconduct is only suspected, or the means, motive or perpetrators behind an obvious crime are unknown. See *In re State (Bowman Search Warrants)*, 781 A.2d at 993 (holding that "in most pre-indictment criminal investigations, the existence of the investigation itself" will justify sealing search warrant materials).[11]

¶ 32. Common or not, the State specified its reasons why the nonpublic information contained in the Lawton affidavit should remain confidential. The State's proposed redaction of the particularized confidential materials, as opposed to wholesale denial of disclosure of all warrant materials, would have satisfied the necessary balance between public access and investigative confidentiality. The court's summary and unsupported dismissal of the

---

[11] The criminal case in *Sealed Documents* was pre-indictment, but post-arrest. 172 Vt. at 154, 772 A.2d at 521. Unlike Vermont, which requires no grand jury indictment to commence a criminal case, New Hampshire mandates prosecution brought by indictment if the crime charged is punishable by death or a prison term greater than one year. Compare V.R.Cr.P. 7(a) (providing that "[a]ny offense may be prosecuted by indictment or information at the option of the prosecuting officer"), with N.H. Rev. Stat. Ann. § 601:1 (2011). That sufficient justification for sealing or redaction may exist in many ongoing investigations calls into question the presumption of access but, as said before, we decline to revisit *Sealed Documents* in this case.

State's justification for nondisclosure and redaction was an abuse of discretion. The court's disclosure order is therefore reversed.[12]

*Reversed.*

¶ 33. **Skoglund, J.,** concurring. I should probably save my breath to cool my porridge, but speak I must. I am concerned that, as written, applied, and discussed in the majority opinion, the Court's rule of public access to search warrant materials does not appropriately identify the public interest. When this Court issued a stay of the trial court's order denying the State's motion to seal the search warrant documents and pleadings, we noted that the matter involved circumstances not present in *In re Sealed Documents*, 172 Vt. 152, 772 A.2d 518 (2001) — circumstances "that militate[d] in favor of a more cautionary approach to releasing the search warrant documents." *In re Search Warrants*, 2011 VT 88, ¶ 2, 190 Vt. 572, 27 A.2d 345 (mem.). In *Sealed Documents*, the victims of the crime were deceased and the suspects in custody. By contrast, in this case, the putative victims were missing and no suspects were in custody. We wrote: "Under these circumstances, both the State and the public have a heightened interest in not undermining the criminal investigation through the revelation of facts not generally known to the public." *Search Warrants*, 2011 VT 88, ¶ 2.

¶ 34. This thought echoed the decision in *Caledonian-Record Publishing Co. v. Walton*, wherein we wrote: "[T]he state has significant interests in protecting the public from criminal activity, prosecuting those who commit crimes, and protecting the privacy rights of individual citizens. These interests may, at times, override the interest in public disclosure." 154 Vt. 15, 21, 573 A.2d 296, 300 (1990). I suggest that when there is an open or ongoing criminal investigation that could be impaired by allowing public access to investigation materials, a court should consider the state of the investigation when balancing the competing concerns and should recognize and consider the Legislature's specific pronouncement that "records dealing with the detection and investigation of crime" are exempted from public inspection and copying. 1 V.S.A. § 317(c)(5). After all, in the Reporter's Notes to Rule 1 for Public Access to Court Records (PACR Rule) is written:

---

[12] Because we conclude that the State's proffer below was sufficient to warrant sealing or redaction, we need not address the argument that the court erred by refusing to conduct an evidentiary hearing on this matter.

> These rules are intended to be comprehensive, reflecting all existing statutory and procedural rule provisions on public access to court records . . . . Where an existing procedural rule or statute establishes the law on public access to a particular record, these rules adopt it by reference so these rules are a complete inventory of access law, whatever its source.

¶ 35. A search warrant will not issue until a judge has reviewed the request by law enforcement for a warrant and probable cause has been found. It is this requirement that makes the material, documents, and/or affidavits submitted with the request to issue a warrant into a court record. Thus, in this matter, PACR Rule 6(b)(15) exempts from public access "[r]ecords of the issuance of a search warrant, until the date of the return of the warrant, unless sealed by order of the court." In this matter we are to decide whether the State made the showing required to seal such records. My problem is with Rule 6(b)(15) and its application.

¶ 36. The warrant requirement exists to ensure that neutral magistrates review applications to invade protected privacy interests of individual citizens. It is not a vehicle for public review of the work of law enforcement. The details of the investigation set forth in the search warrant materials provide a reviewing judge with the information needed to make a determination that probable cause exists for the issuance of the warrant. The materials describe the information available at the time of the applications, and the documents filed with the court upon return of the search warrants describe the search results. In this case, all the documents sought concern an ongoing investigation into the Curriers' disappearance. The Legislature has determined that the public's interest is best served by maintaining the confidentiality of the details of this investigation.

¶ 37. Here, the lower court did not view the State's request from the perspective of the legislation governing access to public records. Why? Probably because of a general understanding that Vermont's Access to Public Records Act does not govern judicial materials.[13] In *State v. Tallman*, this Court had occasion to decide when affidavits of probable cause, filed in connection with the

---

[13] In a footnote in a case from 1988 we opined, "It is doubtful that the public records law applies at all to judicial records in view of the specific statutes in the trial courts and the power of the judicial branch over its records." *Herald Ass'n*

charging information, became public documents. 148 Vt. 465, 537 A.2d 422 (1987). We explained that, prior to inspection by a court, affidavits of probable cause were agency records maintained or compiled in the course of a criminal investigation by police and, as such, were specifically excluded from the definition of a public record. After the affidavit was reviewed by a court, access to the document was then governed by 4 V.S.A. § 693, the statute that administered public access to "records of the court." *Id.* at 472, 537 A.2d at 426. That transformation into a court record continues under the Court's PACR Rules and brings me to the doctrine of separation of powers — what distinguishes and distances 1 V.S.A. § 314 from the PACR Rules, specifically Rule 6(b)(15).

¶ 38. Basically, the doctrine of separation of powers decrees that no branch of government should step on the toes of another. It is one of the primary tenets of American law, established by both the United States and Vermont Constitutions. U.S. Const. arts. I-III; Vt. Const. ch. II, § 5. The doctrine posits that "[t]he Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." Vt. Const. ch. II, § 5. See *Chioffi v. Winooski Zoning Bd.*, 151 Vt. 9, 11, 556 A.2d 103, 105 (1989) (separation of powers is "fundamental principle of our form of government"). However, "[a]n absolute separation of government functions among the coequal branches . . . is not required or even desirable to achieve the Constitution's ultimate goal of effective and efficient government." *State v. Pierce*, 163 Vt. 192, 195, 657 A.2d 192, 194 (1995). Indeed, powers exercised by different branches of government often overlap by necessity, such as when public regulatory boards or commissions exercise regulatory authority granted to them by the Legislature and simultaneously act in a quasi-judicial capacity by adjudicating disputes. See *Trybulski v. Bellows Falls Hydro-Elec. Corp.*, 112 Vt. 1, 6-7, 20 A.2d 117, 119-20 (1941) (certain amount of overlapping of powers is inevitable).

¶ 39. Along with this occasional overlapping of powers and duties comes a necessary respect and deference for the policies of the other branches. We construe statutes, for example, to give effect to the intent of the Legislature, *State v. Ben-Mont Corp.*,

*v. Judicial Conduct Bd.*, 149 Vt. 233, 241 n.7, 544 A.2d 596, 601 n.7 (1988) (citations omitted).

163 Vt. 53, 57, 652 A.2d 1004, 1007 (1994), and we are "traditionally reluctant to substitute our judgment for the experience and expertise of an agency." *Lemieux v. Tri-State Lotto Comm'n,* 164 Vt. 110, 112, 666 A.2d 1170, 1172 (1995).

¶ 40. With these principles in mind, I suggest that a court deciding a motion to seal material submitted in support of an application for a search warrant should not be unimpressed by the clear legislative expression of public interest found in 1 V.S.A. § 317(c)(5). The Legislature's exemption of records dealing with the investigation of a crime from public inspection serves as an unambiguous statement of the public interest in promoting effective law enforcement. Of course, I do not suggest that it is the court's role to promote effective law enforcement through its rules. I do suggest that a court, finding itself in possession of a record deemed confidential by the Legislature, should place some value on that statement of public interest — especially since the Reporter's Notes say the PACR Rules adopt by reference any statute that "establishes the law on public access to a particular record." Reporter's Notes, V.R.P.A.C.R. 1. Yes, I know that PACR Rule 6(b)(15) makes no distinction between warrants issued in ongoing investigations and those that occur after an arrest has been made, but it should. In the name of comity and common sense, I would expand the rule to take into consideration the status of the investigation as a factor to consider when a court is asked to seal the documents supporting a search warrant.

¶ 41. The court below reasoned that "[t]he public has a right to information about the police investigation that is filed with the court, and that access can not cause interference with a completed search." This overly simplistic thought process ignores the fact, as all concede, that the investigation into the disappearance of the Curriers was ongoing. Any one of the searches permitted by the warrants may have been completed, but the investigation was not. I believe the majority opinion appropriately recognizes the substantial threat to the interests of effective law enforcement made in the State's motion to seal, especially when one considers the conundrum faced by law enforcement in attempting to reveal enough information to justify sealing while still avoiding a back door release of the information sought to be withheld.

¶ 42. **Dooley, J.,** dissenting. The majority opinion overturns the prior law concerning access to court records — including both

precedent and codified rules — and thereby effectively destroys the established presumption of openness. We carefully fashioned a standard in *Sealed Documents* that maintained a balance between the broad values of public access and the particular needs of police investigations. 172 Vt. 152, 772 A.2d 518 (2001). Because the majority opinion defies our law and completely topples that balance, I respectfully dissent.

¶ 43. Under our law, search warrant records are accessible after the warrant is served "unless sealed by order of the court." V.R.P.A.C.R. 6(b)(15); accord *State v. Tallman*, 148 Vt. 465, 473, 537 A.2d 422, 427 (1987) ("[A]fter it has been reviewed by a court, an affidavit of probable cause becomes a public document."). The Rules for Public Access to Court Records (PACR Rules) state that a sealing order can be issued "only upon a finding of good cause specific to the case before the judge and exceptional circumstances." V.R.P.A.C.R. 7(a)[14]; see also V.R.P.A.C.R. 1 (stating that the rules "shall be liberally construed in order to implement the policies therein"). This standard is consistent with the specificity requirement that we described in *Sealed Documents*: "the requisite showing of harm 'must be demonstrated with specificity as to *each document*'; general allegations of harm are insufficient." 172 Vt. at 161, 772 A.2d at 527 (quoting *Hammock by Hammock v. Hoffman-LaRoche, Inc.*, 662 A.2d 546, 559 (N.J. 1995)). In short, until today, the State was entitled to have a search warrant

---

[14] The majority makes an argument in footnote 7 that the standard for sealing a document under PACR Rule 6(b)(15) is not the general standard for sealing set out in Rule 7(a) of those rules. As the majority acknowledges, the 2001 Reporter's Notes to the amendment to Rule 6(b)(15) state that the search warrant records become public when the warrant is returned "unless sealed pursuant to § 7(a) of these rules." Although the majority follows the Reporter's Notes on other points, it pronounces the note "arguably in error" on this point. *Ante*, ¶ 17 n.7. Although rules are promulgated by this Court, they are drafted by a Reporter working under the supervision of a committee, in this case the Advisory Committee on the Rules for Public Access to Court Records. See A.O. 40, § 3. The purpose of the Reporter's Notes is to explain to us the intent of the committee in proposing the rule or amendment. Here, the Reporter has explained that the intent was that Rule 7(a) standards apply to the sealing of search warrant records, exactly the result one would expect if the rules are read together as we are required to do. Of course, there may be circumstances where we would reject the Reporter's statement of intent as plainly inconsistent with the text of the rule; this is not one of those circumstances. Thus, I believe that we are bound by the Reporter's factual representation of the intent of the committee whether we like the result or we do not. Obviously, here, the majority does not like the result.

application sealed only if there was a reason specific to the case at hand and the case presented an exceptional circumstance.

¶ 44. The purpose of this standard was to balance the overarching values of openness and the sometimes overriding needs of police investigations. By establishing "the presumptive right of access to court records, including pre-indictment search warrant materials," *Sealed Documents*, 172 Vt. at 161, 772 A.2d at 527, we ensured that transparency would constitute the defeasible default. This presumption did not, however, leave police investigations hamstrung, because the State could prevent access so long as it could demonstrate some particular exigency about the case at hand that would take the case outside this default. All that was required was a showing of some special reason — as the rules put it, "exceptional circumstances."

¶ 45. In this case, the State sought to have all search warrant materials sealed based on general concerns articulated in an affidavit from an officer of the Essex Police Department. I reproduce the relevant paragraphs in full:

> 15) It is common practice in police investigation to keep details learned through investigation confidential, in order to be able to use those details to decipher credible tips and information from non-credible tips and information. If all of the above information were to be released to the public it would significantly hamper our ability to determine what information we receive is legitimate and relevant to our investigation, and what information is not.

> 16) Any potential suspect may be following this investigation in the media. The release of the above information would give any suspect access to most information and evidence the police possess. This would allow a suspect to easily avoid detection and/or respond to police questioning. It is also likely that any potential witnesses or false witnesses may be following media coverage of this investigation. Release of the above information could unduly influence the recollection of true witnesses, or allow any false witnesses to tailor information to fit with what is already known by police.

These paragraphs essentially express two rationales: that retaining nonpublic information is necessary to discern credible from

noncredible statements, and that disclosing the state of the investigation's knowledge might allow a suspect to evade the investigation. The majority embellishes this by stating that the "nonpublic information has a variety of uses, including enabling police to determine the relevancy or importance of information, to identify or exclude putative suspects, test theories, evaluate tips and claimed alibis, discover motives and conduct ruses," *ante*, ¶ 21, as well as allowing police "to tell which facts are incidental and which vital," *ante*, ¶ 26. It is left unexplained how nonpublic information enables police to "determine the relevancy of information" or "test theories" or "discover motives." In the record, the only alleged reasons for confidentiality are to discern credibility and to deny suspects knowledge of the investigation's progress.

¶ 46. These two rationales could apply to *any* information in *any* investigation that has yet to be concluded. They are entirely general.[15] The majority concedes this point, noting that the State's asserted rationales "may be common to all investigations, especially at the pre-arrest stage," and that such rationales "are

---

[15] In contrast, the cases that the majority relies upon generally involved some concerns uniquely related to the case at hand. For example, in *Seattle Times Co. v Eberharter*, 713 P.2d 710 (Wash. 1986), the trial judge had found a specific concern for concealing the identities of the police informants. The court explained:

> [T]he police have been actively seeking the cooperation of individuals associated with prostitution. To overcome the reluctance of this group to cooperate with law enforcement officials, the police have promised to maintain the confidentiality of their informants. The trial judge reasoned that release of the unedited version of the affidavit would jeopardize the inroads made by the police into the confidences of this critical information source. In addition, [the judge] found that the release of the informants' names would place the informants in danger from either the Green River killer or others in the prostitution community who would resent the informants' cooperation with the police.

*Id.* at 711. Similarly, in *PSC Geothermal Services Co. v Superior Court*, the California appellate court held that partial sealing may be permissible where the State was focused on redacting one particular sentence in the affidavit and where the protection of an informant's identity was potentially at issue. 31 Cal. Rptr. 2d 213, 223 (Ct. App. 1994). In that case, however, the court reversed the lower court's order to seal the entire affidavit. *Id.* at 223 ("[E]ven if the sealing of the affidavit were proper, sealing the entire affidavit may have been overbroad."). No similar case-specific concerns are alleged here. Particular concerns such as these are precisely what the specificity requirement of *Sealed Documents* is meant to accommodate.

inherent to active investigations." *Ante,* ¶ 31. Although the State's arguments most obviously apply to all pre-arrest investigations, they would most likely apply beyond arrest as well. Even after an arrest of a suspect, the State may continue to gather information, which will include a need to distinguish credible and noncredible information. Moreover, co-conspirators or alternative suspects may remain at-large, to whom the State will not want to reveal the status of its investigation. Regardless, it is undisputed that the State never alleged anything special about this information or this investigation.

¶ 47. The majority, however, concludes that the specificity requirement for sealing the search warrant materials was nevertheless satisfied. In fact, the majority concludes that the specificity requirement was so clearly satisfied that the superior court's contrary conclusion amounted to an abuse of its discretion. To reach this conclusion, the majority asserts that "specificity . . . do[es] not mean rarity" and "commonality renders the rationale no less specific." *Ante,* ¶¶ 29, 31. According to this logic, the State's justification can be specific, even if it applies to every case. As a result, "[t]hat public disclosure of investigation strategy, tactics and results to date can commonly compromise police work does not make actual examples of such instances any less specific." *Ante,* ¶ 30.

¶ 48. This argument does violence not only to our prior law but to the English language.[16] To say that something is "specific" is normally to say that it is particular and not general. See, e.g., *In*

---

[16] There is a dialogue in Joseph Heller's *Catch-22* that captures the incoherence of treating specificity as the majority does:

> "Who's they?" he wanted to know. "Who, specifically, do you think is trying to murder you?"
> "Every one of them," Yossarian told him.
> "Every one of whom?"
> "Every one of whom do you think?"
> "I haven't any idea."
> "Then how do you know they aren't?"

J. Heller, *Catch-22* 17 (Dell 1962). The State, in this case, is asked to show what facts, specifically, would be harmful to disclose, and it responds essentially with, "Every one of them." And then, when asked to explain why even seemingly innocuous facts are harmful to release, it offers a presumption-flipping, "How do you know they aren't?" This reasoning turns the entire concept of specificity on its head. Nevertheless, in an effort to avoid conceding to overruling *Sealed Docu-*

*re Tyler Self-Storage Unit Permits*, 2011 VT 66, ¶ 18, 190 Vt. 132, 27 A.3d 1071 (contrasting specificity and generality as properties that necessarily trade off against one another). The Oxford English Dictionary defines "specific" as "[h]aving a special determining quality," and as "[s]pecially or peculiarly pertaining to a certain thing or class of things and constituting one of the characteristic features of this." XVI Oxford English Dictionary 157 (2d ed. 1989). Similarly, Webster's defines "specific" as "being peculiar to the thing or relation in question" and as "restricted by nature to a particular individual, situation, relation, or effect: peculiar." Webster's Third New International Dictionary 2187 (2002). The majority concedes that there is nothing special or peculiar or restricted about the rationales offered by the State. It is therefore unclear how accepting these rationales could be compatible with "the presumption that pretrial proceedings and documents are open to the public, closure being the exception rather than the rule." *Tallman*, 148 Vt. at 474, 537 A.2d at 427.

¶ 49. The majority would read "specific" to mean "concrete" or "definite." See *ante*, ¶¶ 15, 22-23. Our disagreement with this reading is not about a battle between dictionaries. In the abstract, "specific" can certainly have this meaning insofar as concreteness and definiteness are ways to distinguish one thing from another. But in this context, this reading is unsupportable. To begin with, this reading is incompatible with the plain language of the governing rule. According to the rule, a sealing order may be issued "only upon a finding of good cause specific to the case before the judge and exceptional circumstances." V.R.P.A.C.R. 7(a). In this context, "specific" cannot mean "concrete" or "definite" — "concrete to the case before the judge" does not make any sense. In context, the term must mean something more like "particular" or "special." This meaning is emphasized by the phrase "exceptional circumstances."

¶ 50. The majority's reading also bears no relation to the purpose of the rule. A requirement of concreteness or definiteness would ensure precision in the reason for sealing. This understanding could make sense if the purpose of the specificity requirement were to force the State to distinguish one particular rationale from others by concretely describing the rationale on which it is

*ments*, the majority adopts this reasoning to pound its new square peg into the well-established round hole.

relying. The purpose of the rule is different, and the State need not hang its hat upon any one particular rationale. The purpose of the requirement is not to distinguish among rationales, but to distinguish among cases. V.R.P.A.C.R. 7(a) (requiring "good cause *specific to the case before the judge* and *exceptional* circumstances." (emphasis added)); see also *Sealed Documents*, 172 Vt. at 162, 772 A.2d at 527 (requiring "fact-specific findings," i.e., specificity relating to the facts of the case). As already described, by ensuring that there is something special about the particular case, the specificity requirement effectuates the presumption of openness. See *Tallman*, 148 Vt. at 474, 537 A.2d at 427. The specificity requirement forces the State to distinguish the case at hand from the default of transparency; it requires "exceptional circumstances." This interpretation of the specificity requirement dovetails with the presumption of openness, whereas the majority's interpretation has no such rationale behind it.

¶ 51. Correctly interpreting the standard from *Sealed Documents* and the rules, the superior court based its decision precisely on the absence of anything special about this case that would overcome the presumption of access. The court determined, "The State has made only general assertions that the police investigation will be jeopardized if information is released."[17] Because the State had not made "a showing of substantial harm, demonstrated with specificity," the court concluded that "[t]he State ha[d] not met its burden of demonstrating compelling reasons that overcome the presumption of public access." This analysis correctly tracked our legal standard. The majority, however, considers this to have been an abuse of discretion[18] because the court "failed to . . . dispel" and never "rebutted, as unfounded

---

[17] This was actually the court's third time responding to the State. The State's first attempt to seal was denied because the documents were not yet public. The State's second attempt to seal was denied, and the court explained, "The Court needs a particularized showing to seal, not a general, it will 'compromise the investigation' to disclose." The State then made a third attempt, including the police affidavit quoted above.

[18] The majority treats the superior court's decision as an abuse of discretion — an almost impossible claim — because it refuses to own up to the fact that it is altering the legal standard for sealing. Under a genuine abuse-of-discretion standard, I cannot see how the superior court's decision that the State's generalized reasons did not constitute "exceptional circumstances" as required by the rules would merit reversal. In reality, the majority is simply announcing a new standard and blaming the trial court for not predicting its action.

or illogical," the State's assertion that releasing nonpublic information *might* harm the investigation. *Ante,* ¶ 21. Against a presumption of openness, however, it is the State's burden to demonstrate that there is something uniquely harmful about disclosure in the case at hand. It is not the court's duty to dispel generalized concerns that harm might occur; it is the State's duty to produce specific concerns.

¶ 52. The majority characterizes this dissent as reading the rule to be "more demanding" or to "require more" than the *Sealed Documents* standard. *Ante,* ¶¶ 17-18. It does so by interpreting *Sealed Documents* as narrowly as possible in order to avoid its holding and then arguing that Rules 6(b)(15) and 7(a), if read on their face, must be an unwarranted expansion of *Sealed Documents.* I completely agree that the standard from *Sealed Documents* and the standard from the rules mean the same thing. As the 2001 Reporter's Notes state, "the court must apply the standards contained in *In re Sealed Documents.*" Reporter's Notes, V.R.P.A.C.R. 6(b)(15). In reality, the difference between this dissent and the majority is not whether the standards of *Sealed Documents* apply; instead it is over the meaning of those standards.

¶ 53. By contorting the specificity requirement of *Sealed Documents* and the rules, the majority overturns our settled law in this area without admitting as much. Before today, the presumption was against confidentiality. Sealing was permitted, but only if there was a reason in a particular case. The majority opinion replaces this practice with a presumption of confidentiality, at least for precharge documents. By accepting reasons that, by the majority's own lights, are common to any precharge investigation, the majority implicitly declares that pre-indictment court records are presumptively confidential. Under today's decision, the State can literally cut and paste paragraphs 15 and 16 of the Lawton affidavit into any precharge motion to seal and be assured of success, at least assuming the court does not "dispel" or "refute" them. Accepting such plug-and-play rationales inverts, for all practical purposes, the presumption created by *Tallman* and *Sealed Documents,* and incorporated into the rules.

¶ 54. This inverted presumption is something the State advocated on appeal. And, as the cases cited by the majority illustrate, it is a presumption that some jurisdictions have adopted. See, e.g., *In re State (Bowman Search Warrants),* 781 A.2d 988, 994 (N.H.

2001). Here, however, there is a rule directly to the contrary so it is wholly inappropriate for the Court to adopt this inverted presumption by decision as the majority does today.

¶ 55. First, I believe that it is a mistake for the Court to change the legal standard while obscuring the change. Although the majority's reasoning has the effect of overruling the *Sealed Documents* standard with regard to pre-arrest investigations, the majority explicitly disavows any such holding. See *ante*, ¶ 13. This method of dealing with the case, the litigants, and the public can only undermine acceptance of our decisions. It also causes confusion, particularly for trial judges who must make decisions on the fly. As Justice Tobriner of the California Supreme Court once complained:

> In simply ignoring [the] line of controlling precedent, the lead opinion can only create uncertainty and confusion; lower courts, faced in the future with [similar cases], are provided no guidance whether to apply previously enunciated principles or the novel interpretation developed by the instant lead opinion.

*People v. Tanner*, 596 P.2d 328, 332 (Cal. 1979) (Tobriner, J., concurring and dissenting); see also *Endermuehle v. Smith*, 372 S.W.2d 464, 470 (Mo. 1963) (Leedy, J., dissenting) ("If this is not to continue to be the rule, then the cases to the contrary should be explicitly overruled, and the matter finally set at rest, and not left in doubt or uncertainty."). If we are going to shift legal standards, we should do so openly.

¶ 56. Second, the State never presented this argument to the superior court. The State filed three motions to seal and a motion to reconsider with the superior court. In none of these filings did the State ever argue that the *Sealed Documents* standard, now ensconced in the rules, should not apply to court documents in a precharge criminal investigation. We routinely reject arguments on the grounds that "[c]ontentions not raised or fairly presented to the trial court are not preserved for appeal." *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 459, 752 A.2d 26, 33 (2000). In this light, the majority's decision to adopt the position only advocated by the State on appeal is a clear departure from "our usual convention barring new arguments for the first time on appeal." *Glassford v. BrickKicker*, 2011 VT 118, ¶ 45, 191 Vt. 1, 35 A.3d 1044 (Burgess, J., concurring and dissenting).

¶ 57. Third, if we want to broaden the exception for public access to search warrant materials to cover the period until the State charges a criminal defendant, we should do that by amendment to the governing rule. If the rule is going to be changed, we have an important process for that in which all interests are represented. The rules were adopted with the intention that they would be "a comprehensive policy on public access" in order to prevent responses to requests that are "ad hoc . . . and may vary from court to court." V.R.P.A.C.R. 1 and Reporter's Notes. The rules can serve this purpose only if they constitute the exclusive set of guidelines for handling public access to court records. Today's decision, by altering the law on public access without altering the rules, creates a divergent set of directives and thereby undermines the rules themselves. We are now saddled with a rule that calls for "good cause specific to the case before the judge" and for "exceptional circumstances," V.R.P.A.C.R. 7(a), but simultaneously with an opinion endorsing "reasons . . . [that] may be common to all investigations," *ante*, ¶ 31.

¶ 58. Fourth, I believe that the *Sealed Documents* standard that is incorporated into the rules correctly balances the public's interest in disclosure with the State's interest in confidentiality. By establishing a presumption of access but one that is not absolute, the *Sealed Documents* standard allows the State to seal documents where there is a particular reason to do so while simultaneously maintaining openness as the default. See *In re Application & Affidavit for a Search Warrant*, 923 F.2d 324, 329 (4th Cir. 1991) ("The balance . . . must be carefully struck in each case; it does not invariably fall on one side or the other."). Precisely because it produces this delicate balance, most courts that have considered the question have held that "the public has a presumptive right of access to [pre-indictment search warrant] materials absent an overriding demonstration of harm to public or private interests." *Sealed Documents*, 172 Vt. at 161 n.8, 772 A.2d at 526 n.8 (collecting cases). In particular, many courts have explicitly rejected the contention that pre-arrest search warrant materials should be treated under a different standard. See, e.g., *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 579 (4th Cir. 2004) ("[N]ot every release of information contained in an ongoing criminal investigation file will necessarily affect the integrity of the investigation. . . . Whether this general interest is applicable in a given case will depend on the specific facts and circumstances

presented in support of the effort to restrict public access."); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988) (holding that for pre-indictment sealing of a search warrant the government must show "specific, on the record findings" that demonstrate that sealing is "essential" and "narrowly tailored" (quotation omitted)); *Floyd v. City of New York*, 739 F. Supp. 2d 376, 380 (S.D.N.Y. 2010) ("[T]hat an investigation is open does not guarantee protection from disclosure . . . .").

¶ 59. The majority is fixated on the possible effect of disclosure on the investigation[19] while ignoring almost completely the reasons for public access to judicial records, and specifically to search warrant records. Indeed, it goes as far as labeling the interest in openness as "farfetched." *Ante*, ¶ 27.

¶ 60. In issuing a search warrant, a judge uses one of the greatest, most intrusive, and most important powers of the judiciary and does so ex parte with no adversary presentation. We justify the exercise of that power in part because the judge is

---

[19] Probably the main demonstration of that fixation is the majority's statement that "[i]t is given that controlling access to information is an advantage that law enforcement must both protect and exploit." *Ante*, ¶ 21. In fact, government control of information is the hallmark of a totalitarian state. Accepting government control as a given in this case is exactly why the majority has lost perspective on the balancing we must perform.

It is ironic that the majority cites as its support for this sentence a quote from a Sherlock Holmes story. As readers of Sherlock Holmes know well, most of the Sherlock Holmes investigations are based initially on a newspaper account of the police investigation of the crime and thereafter on police providing the full content of their investigation to Sherlock Holmes. Thus, in two ways the stories support the exact opposite point from that used by the majority. First, the main intent and effect of the majority decision is to keep information out of the newspaper unless the criminal investigators want it there, which as the majority points out at length, they virtually never want. This would stifle the typical Holmes revelation, which often takes the form: "He rummaged amid his newspapers, glancing over the dates, until at last he smoothed one out, doubled it over, and read the following paragraph." A. Doyle, "The Adventure of the Blue Carbuncle," in *The Original Illustrated 'Strand' Sherlock Holmes* 205 (Wordsworth Special ed. 1989). In fact, as Officer Lestrade comes to Holmes for help in one story, he laughs, "You have, no doubt, already formed your conclusions from the newspapers." "The Boscombe Valley Mystery," in *id.* 169. This leads to a second point: the Sherlock Holmes stories are a demonstration that if police share the investigatory information with members of the public, the investigation is often enhanced, not thwarted. If Sherlock Holmes is to be our guide, we should open criminal investigations, not close them.

publicly accountable and acts under the watchful eye of an informed citizenry. Cf. *State v. Geraw*, 173 Vt. 350, 356, 795 A.2d 1219, 1224 (2002) ("While interposing a warrant requirement between law enforcement officers engaged in such practices and the general public does not lessen the intrusion, it does — at least — ensure that the surveillance has been found to be reasonably necessary by a 'prior independent determination of a neutral magistrate.' " (quoting *United States v. White*, 401 U.S. 745, 783 (1971) (Harlan, J., dissenting))). Necessarily, we must abhor "so dangerous an engine of oppression as secret proceedings before the executive, and the issuing of secret warrants." *In re Kaine*, 55 U.S. 103, 113 (1852).

¶ 61. It is no answer to this point that issuing magistrates are independent and disinterested as the majority argues. *Ante*, ¶ 27. We can say that about all public officials including here the Attorney General. The independence and neutrality of public officials is assured by the transparency of their actions; the proof is in what they do, not what we hope they will do.[20]

¶ 62. I have no doubt that the law enforcement investigation would proceed more efficiently and expeditiously if the officers did not have to obtain judicial approval for some of their acts.[21] I also have no doubt it would sometimes proceed more efficiently and

---

[20] Nor is it an answer that the recipient of a search warrant can always disclose its existence. In a missing person case, such as this one, some of the property to be searched is likely to be that of the missing person, who is not in a position to disclose the search. Moreover, if the search warrant is not public, the media or other members of the public do not know a search occurred and cannot inquire about it. Individuals whose persons, houses, papers and possessions are searched, see Vt. Const. ch. I, art. 11, are rarely neutral and are unlikely to publicly volunteer the fact of a search. Finally, these individuals can disclose the fact of the warrant, but have no knowledge of the grounds on which it was issued.

[21] I agree with Justice Skoglund that this case raises important questions about the separation of powers, but come to a very different answer. The executive branch can choose or not to disclose public records about an ongoing criminal investigation; the effect of the Public Records Act § 317(c)(5) is that it has no legal obligation to disclose. 1 V.S.A. § 317(c)(5). But in this case, it is seeking to force its choice on the judiciary and to overturn the presumed disclosure of judicial records. If we are to be an independent branch of government, with the public trust and confidence of the citizens of this state, we must insist that we make the decision whether secrecy is warranted and balance fully the interests in disclosure against those in nondisclosure. As I stated in the text, I find that the majority, including Justice Skoglund, fail to give virtually any weight to the judiciary's interest in transparency. The result is secret warrants, which I believe can be

expeditiously if everything done in the name of a criminal investigation were secret, including the acts of the judiciary. Just as we cannot allow the former in a free and open society based on law, we cannot allow the latter. I recognize that there are instances where secret warrants are necessary, but they must be few, and narrowly and clearly justified.

¶ 63. Irrespective of the critical policies at issue in this case, I do not believe the presumption of access to be unduly burdensome on the State. Where there is any feature of a case that distinguishes it as requiring confidentiality, the State may seek to have search warrant materials sealed or redacted. Even where there is no reason to depart from the presumption, the State may elect how to proceed. *PSC Geothermal Servs. Co.*, 31 Cal. Rptr. 2d at 223 ("The People know that if certain procedures are employed the resulting evidence may be subject to disclosure or suppression. It is the People's task to tailor their investigation as necessary to minimize or avoid these repercussions."). In this case, the State is concerned that there are many detailed facts in the search warrant applications and supporting affidavits. To the extent that this is true, it is in part due to the State's choice of what to include in those documents.[22] Apparently, some of the details were simply copied from application to application even though they may not be necessary for the specific search warrant request at issue. Insofar as the State contends that its entire investigation would be laid bare to the public, the fault for that circumstance lies with the State.

¶ 64. I have two final points. First, the majority ignores the remedy of redaction, even though the State offered it as an alternative remedy. While I believe that the search warrant records were properly disclosed in their entirety, I further believe that if the majority's position is to prevail, the right remedy is redaction of the content of the records that meets the majority's standard and not the sealing of all information contained in the search warrant documents. As with other parts of the majority

---

justified only in narrow circumstances and not on the showing the State made in this case.

[22] Some of the State's arguments depend on the idea that the police must be able to retain *some* nonpublic information, whatever it may be. It is implausible that the State will generally be required to include every piece of nonpublic information into a search warrant application.

decision, its failure to consider redaction shows that it is using a presumption of secrecy not openness.

¶ 65. If we were to remand to consider redaction, we should in this case allow the court to consider whether the circumstances at the point of remand justify a denial of redaction because the search warrant information is already public. We are essentially issuing an advisory opinion for a frozen moment in time, which very likely bears little resemblance to the current controversy.

¶ 66. Second, as a related point, the lack of speed with which we are able to handle cases of this nature continues to concern me. In the stay decision, I anticipated that we would be unlikely to decide this case in substantially less than a year — a prediction that has been basically accurate. See *In re Search Warrants*, 2011 VT 88, ¶ 5, 190 Vt. 572, 27 A.3d 345 (mem.) (Dooley, J., dissenting). "The time consumption should be expected because the issues are complex and important, but we should always be cognizant that the Legislature has directed that both public records trials and appeals 'take precedence on the docket over all cases,' except those considered to be of greater importance, and should be 'expedited in every way.'" *Rutland Herald v. City of Rutland*, 2012 VT 26, ¶ 56, 191 Vt. 387, 48 A.3d 568 (Dooley, J., dissenting) (quoting 1 V.S.A. § 319(b)). In a case like this one, the time lag has a significant impact on the controversy itself. The state of the investigation and the state of the public's knowledge have undoubtedly changed dramatically since the record before us was constructed.

¶ 67. I wrote the above dissent before the State withdrew its motion to seal the applications and warrants, and before the documents were released. I think the documents show that their release would have had no impact on the course of the investigation and the information in them was already in the public record. This is a demonstration of what will be kept from public access if the standard involves possible harm to an investigation rather than likely or demonstrated harm. I add only that although this decision was close to release when the State withdrew the motion, it still failed to be sufficiently timely to respond to a live controversy.

¶ 68. I concur that this case is not moot under the standard of *State v. Schaefer*, 157 Vt. 339, 345, 599 A.2d 337, 341 (1991), although my view on mootness is related to my position on the merits of the sealing decision. In *Schaefer*, we found that a media

access request was not moot because it raised "general questions about the proper standard to apply in balancing the right of access to criminal proceedings and documents against the Sixth Amendment right of a criminal defendant to a fair trial." *Id.* Here, it is settled that this case is governed by V.R.P.A.C.R. 7(a) and *Sealed Documents.* The trial court saw this case as the application of settled law to specific facts, a decision I believe was correct. If the majority had followed the rule and decision, as I have argued it should have and it professes to have done, I would have found the controversy moot under the *Schaefer* standard. It is only because the majority has amended the rule by decision, and substantially overruled *Sealed Documents* in the context of this case, that this case has become a decision about policy, not the application of policy, and is still alive under *Schaefer.*

¶ 69. I am authorized to state that Justice Johnson joins this dissent.